******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE JAYCE O.*
(SC 19669)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued September 15—officially released December 8, 2016\*\**

*Karen Oliver Damboise* for the appellant (respondent mother).

*Benjamin Zivyon*, assistant attorney general, with whom were *Evan O'Roark*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, and *Gregory T. D'Auria*, solicitor general, for the appellee (petitioner).

*Sharon A. Peters*, for the minor child.

*Opinion*

ESPINOSA, J. The respondent mother, Kaitlyn J., appeals from the judgment of the trial court terminating her parental rights with respect to her minor child, Jayce O.[1] The respondent contends that her right to due process under both the federal and state constitutions was violated because the trial court relied in part, pursuant to General Statutes (Supp. 2016) § 17a-112 (j) (3) (E),[2] on the prior voluntary termination of her parental rights with respect to another child when the respondent was a minor (prior termination).

The respondent also contends that the trial court, in its decision on the petition for termination of parental rights filed by the petitioner, the Commissioner of Children and Families: (1) improperly concluded that the Department of Children and Families (department) made reasonable efforts toward reunification; (2) failed to make a finding that the respondent was unable or unwilling to benefit from those reasonable efforts; and (3) improperly found that the respondent had failed to rehabilitate. We affirm the judgment of the trial court and address each of the respondent's claims in turn.

We begin with the factual findings of the trial court as set forth in its carefully crafted and thorough memorandum of decision.[3] At the time of trial, the respondent was twenty-two years old. "Hers is the life story of a child who fell between the cracks of two parents, too young and immature to have a child themselves. [The respondent] lived with her father after her parents' separation when she was three. When she was out of control and using marijuana, her father would not deal with her. She then went to live with her mother at age thirteen. She apparently was not closely supervised or given proper structure or nurturing attention by either parent. She was out of control, belligerent and unwilling to follow normal parental guidelines. She recalls both parents using drugs and [observed] drug activity when she was quite young. . . . [A]t age fourteen, she became pregnant herself. She followed early in the footsteps of her neglectful parents, and the next events in her life are all too common and to be expected when a child gives birth to yet another child.

"She came into [the care of the department] and her parents' rights to her were terminated. [The respondent] was placed in a home with wraparound services, so she could remain with her infant. Her daughter was born in January, 2008, a few short months before her own fifteenth birthday. To [the respondent's] credit, she remained in the home for [more than] a year. But by July, 2009, stability ended for [the respondent]. [She] ran away from her placement, [and] an order of temporary custody was granted. Her daughter was adjudicated neglected and on November 18, 2010, [the respondent] consented to the termination of her rights

to this child when she herself was just seventeen. Her daughter was adopted by her paternal grandmother and she continued to have some contact with her for a time. [The respondent] remained in [the department's] care until she signed herself out at age eighteen. As noted in [the department's] records at the time, [the respondent] was resistant to treatment, engaged in substance abuse and was unable to benefit from the mental health services offered to her. Those same problems, unfortunately for her, are still with her at present time, some six years later.

"After she left [the department's] care, [the respondent] began a relationship with [a] woman and the two decided to have a child together. She reports she had sex with Jayce's father one time, for purposes of getting pregnant and Jayce was the result. In 2013, she moved with Jayce to California to be with her friend, and lived with her and her family for about a year. The family was not supportive of her and . . . a year later, in 2014, she returned with Jayce, by herself, to Connecticut, and lived for a short time with her paternal aunt and uncle.

"She then planned to move into an apartment with her father, and she did so, but her father never [moved in] and [he] was not financially supportive. Due to [the respondent's] lack of education, she is only able [to] secure employment without significant remuneration and has had considerable difficulty in adequately supporting herself. The efforts to maintain herself and her child and [to] lead a stable and sober lifestyle were overwhelming to her. She regularly smoked marijuana, used other drugs and led a chaotic life, leaving Jayce with different caretakers with criminal records and child protection histories while she partied. There were several [department] contacts with [the respondent] and Jayce before the events [that] led to Jayce's removal.

"On September 12, 2014, a day after the [department's social] worker had warned [the respondent] about going to her substance abuse treatment and getting food for Jayce, the [social] worker arrived at the home to find that [the respondent] was out and Jayce had been left with [her] girlfriend. [The respondent] and her friend had had an argument the night before and her friend said that she was concerned about Jayce as [the respondent] was very abrasive to [Jayce]. There was also no food in the home for Jayce. When [the respondent] returned home, she was belligerent and angrily told the [social] worker to get out of her apartment and her life. She stated that she can 'see whoever she wants' and [the department] cannot run her life.

"An [order of temporary custody] was granted and Jayce was initially placed in the home of a social worker to whom [the respondent] had been close when she herself was in [the department's] care. Thereafter, [Jayce] came into the care of his present foster parents.

He has remained in [their] care since September, 2014."

As for the services provided to the respondent and her progress toward rehabilitation, the trial court made the following findings. "Many services have been provided to [the respondent] by [the department] since Jayce's removal. Specific steps in this case were ordered for her on September 16, 2014, and finalized on January 23, 2015, when Jayce was adjudicated neglected. [The respondent] has not been compliant with these steps nor has she made any significant strides in addressing her continued substance use and ongoing mental health difficulties and medication needs. She fundamentally refuses to believe, despite her assertions to the contrary, that marijuana presents a problem for her. Until recently, she has consistently denied the efficacy of any medications to assist her with her deep-seated mental health difficulties, including self-reported daily panic attacks lasting [twenty] minutes or more and significant anxiety.

"[The respondent] has attended many of the services offered to her, but has failed to engage in any meaningful long-term way. She minimized her past trauma, and has made little progress in trauma-focused therapy. She remains poor at self-regulation, caring for herself emotionally or dealing competently with financial or other issues confronting her. She has attended and participated in drug recovery programs, parenting services, as well as receiving both group and individual therapy for her mental health difficulties for some considerable time.

"The list of service providers and their struggles to keep her engaged and complete the programs demonstrates the reasonable services provided to her. Her therapist and parent coach are clearly supportive of her, but frustrated. She has secured section 8 housing, which she disparages, but nonetheless allows her reasonable accommodation[s], given her limited income. Due to the slow progress being made in her counseling sessions and her medication issues, intensive outpatient services were at one point recommended for her. The coordination of services for her remains a major challenge.

"[The respondent] has taken seriously her parent coaching and her time with Jayce. She and he are affectionate with each other and the child clearly has a connection to her. He is happy to see her when they are able to meet. But in many other respects, [the respondent] continues to be dogged by the same difficulties noted in her own . . . record [with the department] when she was younger. She remains resistant to treatment and change, she is easy to anger, belligerent, and immature in her responses to any demands made on her. She remains convinced she can self-medicate her mental health and other difficulties with the use of marijuana. Her inability to address her significant

underlying needs and problems [was] highlighted in the psychological evaluation performed. . . .

"The court-appointed evaluator noted in his testimony that [he met with the respondent] in March, August and September [of 2015]. She exhibited only a mixed level of cooperation with the process. In March, she was unwilling to stay the entire day, repeatedly distracted and both irritable and irritated, and hostile. She constantly permitted interruptions by focusing on cell phone texts, despite instructions not to do so. She could not concentrate and focus and gave other things too much precedence. She was unwilling to respond to and engage with the evaluation. She would not speak with any level of openness about herself. It was apparent that topics about past emotional injury to her continued to trouble her. She insisted on leaving early so that she could attend a birthday party for her younger girlfriend, forcing her [social] worker to transport her early.

"She was unwilling, the evaluator noted, to be forthcoming about the nature of her relationship with her girlfriend and much about her own inner life. She also remained unable, at that time, to psychologically understand why she was a risky parent for Jayce and that she could and did jeopardize her child's safety.

"Nonetheless, given the seriousness of the [the department's] claims against her and the pending termination proceedings, as well as her son's connection to her, the evaluator reported that: '[The respondent] relates very effectively to [Jayce]. He is delighted to see her and is very responsive to her. The [respondent] is able to read him well and to anticipate his behaviors and manage them well. The [respondent] has the capacity to develop her relationship with Jayce. In terms of parenting ability alone, she probably has the capacity to develop a satisfactory overall parenting capacity for Jayce. Her danger most likely would come from other areas of her life, including her relationship problems, her distrust, her oppositional and defiant tendencies and her clinical difficulties. She remains at risk for substance abuse.'

"[The evaluator] recommended that [the respondent] receive an additional six months in which to rehabilitate while Jayce remained in the foster home. He recommended services that [the respondent] would need to complete for reunification to progress. They included substance abuse maintenance treatment, medical mental health treatment to address her anxiety problems and panic problems as well as to help her with her irritability and anger, anger management treatment, combined individual psychotherapy to address her psychological challenges and underlying anger, distrust, irritability and [post-traumatic stress disorder] symptoms.

"By early May, 2015, [the respondent] had been sober for some time and it was expected that further reunification services could begin. But testing and her own admission revealed just at this crucial time in the decision-making concerning her ability to reunify with Jayce, [the respondent] had again begun using drugs. In addition, she became convinced that the medication she was prescribed did not help her mood. She unilaterally stopped taking those medications. She did not discuss her decision with her medication providers or seek different dosages for increased effectiveness.

"In August and early September, the court-appointed evaluator met with [the respondent] again. He spoke with many of her treatment providers concerning her progress. It is apparent in his report, that by late August and early September, [the respondent] continued to deny marijuana was a problem for her. She has maintained this stance, despite the fact that her reunification efforts with Jayce were derailed by it. She is insistent that it helps her with her anxiety and she does not see why she cannot use it in that fashion.

"[The respondent] again did not fully participate in the evaluation process, and presented as before as irritable and defensive and using poor judgment, although her mood improved as time went on. She did not believe she needed medication for her anxiety, attention difficulties and to stabilize her mood. She stated she went [twenty-two] years without such drugs. 'I am just under stress and I can go another [twenty-two] years without it too.'

"At that point in time, given all her treatment providers' reports about her very slow progress and with her continued moody, irritable oppositional behavior, her prognosis was not good. The evaluator stated that [the respondent]: 'meets some of the diagnostic criteria for [p]ost-[t]raumatic [s]tress [d]isorder, [b]orderline [p]ersonality [d]isorder and [d]ysthymic [d]isorder . . . . [The respondent] still has strong reservations about the consumption of clinical services and the use of medications to manage her turbulent and unpredictable emotions. These attitudes can interfere with diagnostic and treatment progress.'

"[The evaluator] could not recommend reunification and noted that [the respondent] needed an additional [eight to twelve] months to establish an unbroken rehabilitation trajectory [that] has durability and a satisfactory measure of reliability. He noted that it is less risky for Jayce to have [the respondent's] rights terminated and be free for adoption than to postpone a permanency decision so much longer. His testimony in court echoed the same strong opinion." (Footnotes omitted.)

The court summarized its findings regarding the respondent's progress, stating that "it is apparent that [the respondent] has not progressed far, despite many

interventions, from the observations made about her psychological status as a teenager in [the department's] care. She remains significantly resistant to clinical treatment and medication to help with her intrusive anxiety and regular panic attacks, to therapeutic interventions requiring her to examine her emotions and to limiting her use of marijuana, despite her own testimony to the contrary about this. She is currently on medication which she believes does give her relief and she wishes she had received it earlier. Nonetheless, her anger and irritability and mood continue to make her a very risky parent for Jayce, despite her evident ability to connect to him.

"Her parent coach is more hopeful that [the respondent] could do better with supports in place, although the length of time for such rehabilitation was uncertain. Unfortunately, given the totality of the evidence, the court does not find this likely, given her demonstrated and persistent resistance to such supports. How much greater will be her opportunity to end such involvement when the eyes of others and the court are no longer on her? The court also concludes, from all of the clear and convincing testimony and evidence in the record, that [the respondent] is not in a position to care for her young son either now or in the foreseeable future, given Jayce's age and needs for structure, nurturing and permanency in his young life."

With respect to Jayce, the trial court made the following additional findings. "Jayce will be three in December. He has been in foster care a little over one year. . . . He remains attached to [the respondent] and enjoys visiting with her. When he came into care, he was in need of Birth to Three services as his speech was significantly delayed. He also had significant delays in his personal and social development as well as his cognitive development. He knew only a very few words and would point and grunt when he wanted something. He often grew frustrated. The Birth to Three provider noted the focus was on communication and very soon, Jayce made great progress. She worked regularly with the foster parents as well as with [the respondent] to support this child. He now is on a more normal trajectory and his cognitive and social skills are now in the normal range. Nonetheless, he will receive services through the end of his third year, to make sure his progress is secure and solidified.

"He is presently in nursery school and is doing well, after he was transitioned to a second day care program last school year. It is apparent that he needs significant structure and predictability in his life. When there are too many changes, he regresses and needs additional help, as happened this summer when he was away on vacation and then transitioned to nursery school. He is now a happy outgoing child, who does well when he has the support and structure he needs. He has done

well in his present home and, as noted, is happy to see [the respondent] regularly as well."

In a subsequent articulation of its memorandum of decision, the trial court clarified that, notwithstanding its finding, pursuant to § 17a-112 (j) (1), that the department had made reasonable efforts toward reunification, the court also found, pursuant to the same subsection, that the respondent was unable or unwilling to benefit from those reasonable efforts.

## I

### DUE PROCESS

We first address the respondent's claim that, by grounding its judgment terminating her parental rights with respect to Jayce, in part, on the prior termination of her parental rights as to another child, the trial court violated her right to procedural due process. Specifically, the respondent claims that reliance on the prior termination, pursuant to § 17a-112 (j) (3) (E), was improper because she was a minor at the time that she consented, and she lacked notice that one consequence of her consent would be that the petitioner might be able subsequently to file coterminous petitions with respect to another child. She also argues that consensual terminations in general do not serve as a reliable indicator of a lack of parental fitness, particularly when too much time has elapsed between the prior termination and the present proceeding. We conclude that the trial court's reliance on the prior termination did not violate the respondent's right to procedural due process.[4]

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews* v. *Eldridge*, 424 U.S. 319, 333, [96 S. Ct. 893, 47 L. Ed. 2d 18] (1976) . . . . In reviewing a procedural due process claim, we must first determine whether a protected liberty or property interest is involved. If it is, then we must determine the nature and extent of the process due. . . .

"A due process violation exists only when a claimant is able to establish that he or she was denied a specific procedural protection to which he or she was entitled. The type and quantity of procedural protection that must accompany a deprivation of a particular property right or liberty interest is determined by a balancing test, weighing: (1) the individual interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the [s]tate's interest in the procedures used, including the fiscal and administrative burdens that any additional or substitute procedures would entail." (Citation omitted; internal quotation marks omitted.) *In re Tayler F.*, 296 Conn. 524, 553–54, 995 A.2d 611 (2010).

There is no question that the respondent's individual

interest—her right to parent her child—is a fundamental right, entitled to constitutional protection. *Troxel* v. *Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (observing that parents' interest "in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court"). We have explained that "[u]nquestionably, these important rights are severely threatened by the state's initiation of termination proceedings. Such proceedings may result not only in the modification or limitation of parental rights, but may irrevocably sever the relationship between parent and child. . . . This deprivation is unique and complete. . . . Consequently, under the first prong of the *Mathews* . . . test, the private interest of a parent in a termination proceeding is considerable." (Citations omitted.) *In re Alexander V.*, 223 Conn. 557, 561, 613 A.2d 780 (1992).

The second prong of the *Mathews* test requires us to consider, under the particular facts and circumstances of the present case, whether and to what extent the trial court's consideration of the respondent's prior termination gave rise to a risk of erroneous deprivation of her parental rights, and the probable value of any additional procedural safeguards. See *Mathews* v. *Eldridge*, supra, 424 U.S. 335. Our review of the respondent's claims reveals that she has not demonstrated that the consideration of that prior termination gave rise to *any* risk of erroneous deprivation of her parental rights. That is, in contrast to the respondent's claims, the record demonstrates that she was provided with sufficient procedural safeguards to protect her fundamental right to parent her child, including sufficient notice of proceedings, additional visitation time, and the provision of numerous services to assist her with rehabilitation. She was also provided with specific steps and given an additional six months of time to rehabilitate, even though neither of these procedural protections is required by § 17a-112 (j) (3) (E). In short, as we now set forth in detail, the respondent was provided with more than adequate procedural safeguards to protect her fundamental right to parent and every effort was made to assist her in rehabilitating sufficiently in order to be reunified with her child.

We begin with the observation that a prior termination of parental rights, standing on its own, would be insufficient to support the termination of parental rights pursuant to § 17a-112 (j) (3) (E). In order to bear its burden to demonstrate that a parent's rights should be terminated under that provision, the petitioner is required to prove the following, by clear and convincing evidence: (1) the department has made reasonable efforts toward reunification, or the parent is unwilling or unable to benefit from such efforts; (2) termination is in the best interest of the child; and (3) the child is under the age of seven years and is neglected or uncared

for, and the parent has failed, or is unable or unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, the parent could assume a responsible position in the life of the child, and the parent's parental rights with respect to another child were previously terminated. General Statutes (Supp. 2016) § 17a-112 (j).

The petitioner's failure to bear her burden as to any single one of these elements will result in a denial of the petition for termination of parental rights, even if the petitioner proves all of the remaining elements by clear and convincing evidence. Moreover, there is no evidence in the record that the trial court considered the respondent's prior termination in holding the petitioner to her proof on the remaining elements. To the contrary, the trial court's memorandum of decision reflects that although the court held the petitioner to her burden to prove the prior termination by clear and convincing evidence, the primary focus of the court's inquiry was on determining whether the department had provided the respondent with reasonable services and whether she had rehabilitated. The court's decision further reflects that the court did not rely on the prior termination to conclude that the respondent failed to rehabilitate. Instead, in arriving at that conclusion, the court evaluated only the evidence that was directly relevant to the issue of whether the respondent had rehabilitated.

Our review of the particular procedural protections afforded to the respondent in the present case provides further support for the conclusion that she was given the process that she was due. Before the department invoked the ninety-six hour hold on Jayce on September 12, 2014, the social worker assigned to the case had visited the respondent's apartment a number of times, putting the respondent on notice that the department had legitimate and serious concerns regarding Jayce, and also allowing the department to begin providing services to the respondent. Specifically, during the very first conversation between the social worker and the respondent, in August, 2014, the respondent agreed to undergo a substance abuse evaluation and to accept a referral for Jayce to Early Headstart. That visit had been prompted by a neighbor's report that she had heard Jayce crying for an extensive period of time, and had entered the apartment after knocking yielded no answer. The neighbor discovered Jayce wedged between the wall and the sofa, with abrasions on his shoulders. The " 'babysitter' " was passed out. When the social worker reported to the home to investigate the report, an adult male answered the door—a person who the social worker later discovered had a criminal record and a history of child protection involvement. During the visit, the respondent admitted to using marijuana regularly and indicated that she had no intention

of quitting. Soon after this initial visit, the social worker learned that the respondent had missed an appointment for a Birth to Three referral, had failed to attend the substance abuse assessment and failed to follow up on the referral to Early Headstart.

The same concerns dominated the next visit that the social worker made to the respondent's home. The respondent acknowledged missing the Birth to Three appointment but denied receiving an intake packet from Early Headstart, and questioned the need for a substance abuse evaluation. She and the social worker also discussed the looming threat of eviction and the lack of food in the home. The only food in the apartment was a half empty box of cereal. The social worker told the respondent that she would return the following day.

When the social worker returned the next day, September 12, 2014, the respondent was not there, and had left Jayce in the care of her seventeen year old girlfriend, with only a box of frozen peas in the apartment. When the respondent returned home, the social worker again raised the issues of the respondent's lack of appropriate follow-through in accepting services that had been referred to her, her ongoing substance abuse and her reliance on inappropriate caregivers. The respondent ordered the social worker to leave, stating that she would use whoever she wanted to watch Jayce, and that she would continue to use marijuana.

After the department removed Jayce from the home, the respondent's rights were safeguarded by a number of procedural protections, beginning with the provision of appointed counsel, who represented her at the September 26, 2014 preliminary hearing on the petitioner's motion seeking an order of temporary custody. The respondent was also provided with preliminary specific steps as early as September 16, 2014. The specific steps required her to take part in counseling, focusing both on individual mental health and the development of parenting skills, with the goal of improving her judgment and helping her to understand how her poor choices impacted Jayce. She also was required to accept in-home support services, follow recommendations for substance abuse treatment and submit to random drug testing. She was prohibited from using illegal drugs or abusing alcohol or medicine. She was required to cooperate with service providers, including those providing Birth to Three and individual counseling services. Additionally, she was ordered to cooperate with court-ordered evaluations, secure or maintain adequate housing and a legal income, refrain from involvement in the criminal justice system, and participate in supervised visitation with Jayce. The respondent signed an acknowledgment of receipt of the preliminary specific steps and, by so doing, agreed to cooperate with them. She also acknowledged: "I understand that if I do not follow these steps the existing order or disposition may

be changed. I understand that if I do not follow these specific steps it will increase the chance that a petition may be filed to terminate my parental rights permanently so that my child may be placed in adoption. I understand that I should contact my lawyer and/or [the department social] worker if I need help in reaching any of these steps." These specific steps served to place the respondent on notice both of what she was required to do in order to regain custody of Jayce and of the possible consequences of failing to comply with the specific steps. The specific steps also provided her with her best road map toward rehabilitation.

The respondent was afforded every opportunity to comply with the specific steps and to rehabilitate. She was provided with a myriad of services that were specifically targeted to assist her in meeting those requirements. Those services included individual therapy with Janet Juliano, who provided her with trauma focused, cognitive behavioral therapy in order to address her current anger management and other mental health issues by focusing on her childhood trauma. The department also offered her group therapy for her anger management issues, but she declined to participate. She was provided with parent coaching and education through Connect to Kids, the service provider that supervised her visitation with Jayce. She received case management services, which included assistance in obtaining housing, as well as furniture and items for Jayce. Although the department did not pay the balances on the respondent's prior bills, it worked with her on budgeting so that she could make payments. She received treatment for her substance abuse issues, including a referral to a relapse recovery group, and also received medication management services. She and Jayce also received services through Birth to Three. Finally, the department arranged for the respondent to meet with a court-appointed psychological evaluator, who met with her on at least two occasions. Despite receiving all of these services, the respondent was unable to achieve a level of rehabilitation that would encourage the belief that within a reasonable period of time, considering Jayce's age and his needs, the respondent would be able to assume a responsible position in his life.

It is noteworthy that, although the petitioner filed coterminous petitions on September 16, 2014, Jayce was adjudicated neglected on January 23, 2015, and the trial on the petition for termination of the respondent's parental rights was delayed specifically for the purpose of allowing the respondent more time to rehabilitate. The actual procedure that the respondent received, therefore, was not the typical procedure received by a respondent when the petitioner files a coterminous petition and the adjudication of neglect and termination of parental rights are decided simultaneously. This departure from the usual procedure renders irrelevant the respondent's claim that she lacked notice that her

prior termination would allow the petitioner to file a coterminous petition in the present case. She does not raise any additional claims of lack of notice with respect to the proceedings. Finally, at trial, the respondent cross-examined the petitioner's witnesses, and introduced evidence and presented testimony in support of her case.

The respondent does not identify any additional procedural safeguards that would have reduced any risk of erroneous deprivation. Instead, she claims that the trial court in the present case should not have relied on her prior termination of parental rights. We agree with the trial court that the respondent's argument, rather than asking for an additional procedural safeguard, suggests that this court should modify the statutory requirements of § 17a-112 (j) (3) (E). For the sake of argument, however, we assume that in advancing this claim, the respondent has identified an additional procedural safeguard. We therefore consider whether she would have received any greater protection of her fundamental right to parent J if the trial court had not been required to consider the prior termination of her parental rights as one of the elements that the petitioner was required to prove in order to prevail on the petition. That inquiry will allow us to determine the probable value, if any, of the change advocated by the respondent.

The respondent essentially offers two arguments in support of her contention that reliance on her prior termination violated her right to procedural due process. First, she argues that her consent to the prior termination should not be given effect in the present case because she was a minor at the time that she consented, and because she lacked notice that one of the consequences of her consent was that the petitioner would be able to file coterminous petitions, allowing her no opportunity to rehabilitate. Second, she argues that the prior termination does not provide a reliable indicator of her current ability to parent because it was consensual rather than involuntary, and also because too much time had passed between the prior termination and the present termination proceedings. We emphasize that the task before us in considering the respondent's procedural due process claim is to determine whether the change in procedure advocated by the respondent would have decreased the risk of erroneous deprivation of her fundamental right to parent. Because we conclude that the respondent received the same process that she would have received under § 17a-112 (j) (3) (B) (i), which does not require the consideration of a prior termination of parental rights, we need not address the substance of the respondent's arguments in favor of her claim that her prior termination should not have been considered.

Just as required by § 17a-112 (j) (3) (E), in order to

prevail on a petition for the termination of parental rights pursuant to § 17a-112 (j) (3) (B) (i), the petitioner must prove by clear and convincing evidence the department's reasonable efforts or the parent's inability or unwillingness to benefit therefrom, and that termination is in the best interest of the child. In addition, under General Statutes (Supp. 2016) § 17a-112 (j) (3) (B) (i), the petitioner must prove by clear and convincing evidence that "the child . . . has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." See also *In re Elvin G.*, 310 Conn. 485, 499, 78 A.3d 797 (2013) (construing § 17a-112 [j] [3] [B] [i] to require provision to parent of specific steps toward rehabilitation prior to termination of parental rights).

As we have already observed, § 17a-112 (j) (3) (B) (i), unlike § 17a-112 (j) (3) (E), does not require the petitioner to prove that the parent had a prior termination of parental rights with respect to another child. There are two additional distinctions between § 17a-112 (j) (3) (B) (i) and (E), that are noteworthy. First, in order to terminate a parent's rights under § 17a-112 (j) (3) (B) (i), the parent must have been provided with specific steps toward the goal of rehabilitation. By contrast, under § 17a-112 (j) (3) (E), a parent's rights may be terminated without the provision of specific steps. Second, under § 17a-112 (j) (3) (B) (i), the trial court may grant a petition for termination only if there was a finding of neglect in a *prior* proceeding, whereas pursuant to § 17a-112 (j) (3) (E), the petitioner may seek a simultaneous adjudication of neglect and a judgment terminating parental rights.

In the present case, as we have already noted, the respondent was provided with specific steps in September, 2014. Additionally, although the petitioner initially filed coterminous petitions pursuant to § 17a-112 (j) (3) (E), Jayce was adjudicated neglected in January, 2015, and action on the petition for termination was postponed specifically for the purpose of allowing the respondent additional time to rehabilitate. Accordingly, the respondent was given the same process that she would have received if the petitioner had proceeded under § 17a-112 (j) (3) (B) (i). That is, just as would have occurred under § 17a-112 (j) (3) (B) (i), the respondent was provided with specific steps toward rehabilitation and was allowed time to rehabilitate—a little more than one year. Moreover, although the petition for neglect and the petition for termination were filed simultaneously, the court first adjudicated Jayce

neglected, and only addressed the petition for termination of parental rights at trial, more than six months later. Accordingly, because she received the same process that she would have received even if her rights had not been terminated pursuant to § 17a-112 (j) (3) (E), in part, on the basis of the prior termination, the respondent has failed to demonstrate that the procedural change that she advocates would have provided her with any benefit.

Because we conclude that the respondent has failed to show that, under the facts of the present case, the requirement of § 17a-112 (j) (3) (E) that the petitioner prove the prior termination by clear and convincing evidence created any risk of erroneous deprivation of the respondent's parental rights, and that she also failed to demonstrate that she would have received any additional benefit if the court was not required to consider the prior termination, it is unnecessary for us to consider "the [s]tate's interest in the procedures used, including the fiscal and administrative burdens that any additional or substitute procedures would entail." (Internal quotation marks omitted.) *In re Tayler F.*, supra, 296 Conn. 554; see also *Mathews* v. *Eldridge*, supra, 424 U.S. 335. Accordingly, we conclude that the respondent has failed to demonstrate that her right to procedural due process was violated by the trial court's consideration of the prior termination of parental rights.

## II

## REASONABLE EFFORTS AND INABILITY OR UNWILLINGNESS TO BENEFIT THEREFROM

The respondent next claims that the trial court improperly concluded that the department made reasonable efforts toward reunification and that the trial court failed to make a finding that she was unable or unwilling to benefit from reasonable efforts. We disagree.

We have explained that "the [petitioner] must prove either that [the department] has made reasonable efforts to reunify or, alternatively, that the parent is unwilling or unable to benefit from reunification efforts. Section 17a-112 (j) clearly provides that the [petitioner] is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Emphasis omitted.) *In re Jorden R.*, 293 Conn. 539, 552–53, 979 A.2d 469 (2009). Although the trial court did not, in its November 5, 2015 memorandum of decision, expressly state that it found that the respondent was unable or unwilling to benefit from reunification efforts, the court later clarified that it had made that finding. Specifically, in its January 20, 2016 articulation, the court explained that it had found that the respondent was both unwilling and unable to benefit from those efforts. That finding was supported by suffi-

cient evidence in the record, as explained at length in the trial court's memorandum of decision. See *In re Gabriella A.*, 319 Conn. 775, 789–90, 127 A.3d 948 (2015) (trial court's finding that respondent was unable or unwilling to benefit from reunification efforts reviewed for evidentiary sufficiency).

Because the court stated in its articulation that it had found that the respondent was neither willing nor able to benefit from the department's reasonable efforts toward reunification, it was not necessary for the court to make any finding as to whether the department's efforts were reasonable.[5] See id. We reject the respondent's suggestion that the court's failure to make this finding expressly in the memorandum of decision precluded the court from later clarifying that it had made the finding.

## III

### FAILURE TO REHABILITATE

Lastly, the respondent argues that the trial court improperly found that she had failed to rehabilitate. In support of her claim, the respondent points to evidence in the record that: she complied with the specific steps; the decision to postpone the trial on the petition for termination was made in light of her progress up to that point; the trial court granted her motion for additional visitation; and her service providers observed that she was making progress and her individual counselor stated to the court-appointed evaluator that if the respondent had the proper services in place and received the proper medication, she would in time be able to provide a stable home for Jayce.[6] We disagree that the evidence relied on by the respondent calls into question the sufficiency of the evidence to support the trial court's finding that she failed to rehabilitate.

We review the trial court's subordinate factual findings for clear error, and review its finding that the respondent failed to rehabilitate for evidentiary sufficiency. *In re Shane M.*, 318 Conn. 569, 587–88, 122 A.3d 1247 (2015). In reviewing that ultimate finding for evidentiary sufficiency, we inquire "whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]." (Internal quotation marks omitted.) Id., 588. We emphasize that "[i]t is not the function of this court to sit as the [fact finder] when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the [judgment of the trial court] . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the [judgment] of which it is reasonably capable. . . . In other

words, [i]f the [trial court] could reasonably have reached its conclusion, the [judgment] must stand, even if this court disagrees with it." (Internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 442, 815 A.2d 119 (2003).

An important corollary to these principles is that the mere existence in the record of evidence that would support a *different* conclusion, without more, is not sufficient to undermine the finding of the trial court. Our focus in conducting a review for evidentiary sufficiency is not on the question of whether there exists support for a different finding—the proper inquiry is whether there is *enough* evidence in the record to support the finding that the trial court made. Applying that standard to the present case, we conclude that there was sufficient evidence in the record to support the trial court's finding that the respondent failed to achieve a sufficient degree of rehabilitation.

The trial court offered the following summary of the respondent's failure to rehabilitate: "She has not been compliant with [the specific] steps nor has she made any significant strides in addressing her continued substance use and ongoing mental health difficulties and medication needs." The court found that the respondent persisted in refusing to accept that her use of marijuana was a problem for her, and also observed that she "consistently denied the efficacy of any [prescribed] medications to assist her with her deep-seated mental health difficulties . . . ." The court further determined that although the respondent attended many of the services that were offered to her, she failed to engage in a meaningful manner. Further, the court found that the respondent had made little progress in her trauma focused, individual therapy, and she had not made significant gains in her ability to regulate herself or in learning to deal with financial or other problems that confronted her. The court also noted the respondent's relapse in May, 2015, and her unilateral decision to stop taking the medications that had been prescribed to her for her mental health.

The court also relied on the report of the court-appointed evaluator, who reported that as late as August and early September, 2015, shortly before trial, the respondent continued to deny that her marijuana use was a problem for her. The court cited to the evaluator's conclusion that he could not recommend reunification, and also noted that the evaluator had reported that the respondent "needed an additional [eight to twelve] months to establish an unbroken rehabilitation trajectory [that] has durability and a satisfactory measure of reliability."

The trial court observed that the one bright spot was that the respondent has done well in her supervised visitation with Jayce, and has maintained a strong bond with him. That alone, however, was not sufficient to

persuade the court that, given the respondent's continued resistance to clinical treatment, her denial of the effects of her marijuana use on her ability to parent Jayce, her slow progress in dealing with her mental health issues, and her resistance to medication, that the respondent would be able "to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." General Statutes (Supp. 2016) § 17a-112 (j) (3) (E). The evidence relied on by the trial court was more than sufficient to support its finding that the respondent failed to rehabilitate.

The respondent's argument to the contrary emphasizes that some of the evidence in the record could have supported the opposite conclusion. While that may be true, it is not relevant to our analysis of whether there exists sufficient evidence in the record to support the trial court's ultimate finding that the respondent failed to rehabilitate. As we have explained, the mere fact that there was evidence in the record that would have supported a different finding is not enough to call into question the sufficiency of the evidence that does provide support for the court's finding.

Additionally, much of the evidence relied on by the respondent, although it may provide some support for the conclusion that she made progress, is not inconsistent with the trial court's finding that she failed to rehabilitate. For example, she cites to the extra time that she was given to rehabilitate in light of her progress up to that point in time. Allowing a parent additional time to rehabilitate is not dispositive, one way or the other, on the issue of whether the parent has successfully rehabilitated. While such a decision reflects the court's belief that rehabilitation is possible, it also necessarily means that the court does not believe that the parent has at that time successfully rehabilitated.

Another piece of evidence relied on by the respondent is similarly consistent with the trial court's finding that she failed to rehabilitate. She notes that her service providers reported to the court-appointed evaluator that she had made significant progress. Although that general statement reflects well on the respondent, and the providers did report to the evaluator that the respondent had made significant progress, that statement provides an incomplete picture. For example, Andrea Fisher, who supervised the respondent's visitation with Jayce, and provided her with parent coaching and education, generally had positive comments about the respondent's progress, and stated that her parenting skills were sufficient at that time to support reunification. She also reported, however, that it was not possible to predict how the respondent would parent when not supervised, "especially if her clinical and relation-

ship issues are unresolved." Fisher's opinion that the respondent would be ready for reunification, therefore, was conditioned on the resolution of the respondent's clinical issues—issues that the trial court expressly found had not been resolved. Juliano, the respondent's individual therapist, provided a similar report. Although Juliano opined that the respondent "would be able to" provide a full-time home for Jayce, she qualified that statement on the provision of proper services and medication. It is significant that as of the date of trial, the court found that the respondent continued to deny the efficacy of prescribed medications and to insist that her self-medication with marijuana was a viable alternative. The court specifically noted, in fact, that the opinions offered by her providers—that the respondent may, with proper supports and medications, be able to rehabilitate—left the estimated time required for such rehabilitation uncertain. That lack of certainty was rendered even more significant in light of the respondent's continued resistance to supports. The evidence relied on by the respondent, therefore, does not call into question the trial court's determination that she failed to rehabilitate.

The judgment is affirmed.

In this opinion the other justices concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** December 8, 2016, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Jayce's father, whose parental rights were also terminated by the judgment of the trial court, has not appealed from that judgment.

[2] Although § 17a-112 (j) has been amended by the legislature since the events underlying this appeal; see, e.g., Public Acts 2016, No. 16-70; Public Acts 2015, No. 15-159; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, all references to § 17a-112 (j) in this opinion are to the version appearing in the 2016 supplement to the General Statutes.

[3] We take the somewhat unusual step of incorporating the trial court's statement of its factual findings in its entirety in order to emphasize the meticulous and thorough nature of those findings, which provides the best illustration that the trial court properly considered all of the elements of § 17a-112 (j) in arriving at its ultimate conclusion that the respondent's parental rights should be terminated.

[4] We observe that the respondent has *not* claimed that her right to substantive due process was violated. Nor has she claimed that § 17a-112 (j) (3) (E) is unconstitutional on its face. She has claimed only that the statute is unconstitutional as applied to her and only insofar as it deprives her of procedural due process.

[5] As for the respondent's challenge to the trial court's finding that the department made reasonable efforts, we merely observe that the respondent does not claim that there is insufficient evidence to support that finding. Instead, she argues that, because at one point in the memorandum of decision the trial court stated that the department was not statutorily required to make reasonable efforts toward reunification pursuant to § 17a-112 (j) (3) (E), the court's determination that the department's efforts were nonetheless reasonable was improper. The respondent's argument is meritless. The court's isolated statement does not invalidate its careful and thorough summary and analysis of the efforts made by the department and its finding that those efforts were reasonable.

[6] The respondent also claims that the petitioner's failure to present evi-

dence regarding the services that were offered to her in connection with the *prior* termination is somehow relevant to the sufficiency of the evidence to support the trial court's determination that, with respect to the *present* termination, the respondent has failed to rehabilitate. She also claims that the petitioner failed to present evidence of any efforts she may have made to rehabilitate herself between the prior termination and the filing of the conterminous petition in the present case. Neither the services that were offered to the respondent during the proceedings in the prior termination, nor any efforts that she made in the time period between the two termination proceedings is relevant to the issue of whether the respondent failed to rehabilitate sufficiently and in time to be able to parent Jayce.

———————————————