******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE YOLANDA V. ET AL.*
(AC 42870)

DiPentima, C. J., and Elgo and Harper, Js.

*Syllabus*

The respondent mother appealed to this court from the judgments of the trial court terminating her parental rights with respect to her minor children. She claimed that the trial court improperly concluded that she failed to achieve the requisite degree of personal rehabilitation required by the applicable statute (§ 17a-112), and that termination of her parental rights was in the best interests of the children. *Held*:

1. The trial court properly determined that the respondent mother failed to attain the degree of rehabilitation sufficient to warrant the belief that, at some time in the foreseeable future, she would be capable of assuming a responsible position with respect to the care of her children: the evidence in the record belied the mother's assertion that she was compliant with the court-ordered specific steps for the eight and one-half months immediately preceding trial, as the record contained sufficient evidence for the trial court to conclude that the mother had not corrected several of the factors that led to the initial commitment of her minor children, including that she did not comply with certain, random toxicology screenings, she was arrested and convicted for certain drug related crimes, she did not comply with securing a legal income, she missed three supervised visits with her children, and the record substantiated the determination made by the trial court that the substance abuse, mental health, and parenting issues that led to the initial commitment of the mother's minor children continued to plague her because, although she completed some services, she failed to benefit from such services; moreover, in evaluating the mother's rehabilitation efforts, the trial court was mindful of the specialized needs of the minor children, and the court also properly considered the mother's history with the Department of Children and Families since 2002 and her history and unsuccessful attempts at reunification with her older children.

2. The trial court properly determined that termination of the respondent mother's parental rights was in the best interests of the minor children, who needed permanency, continuity, and stability in their lives; the evidence in the record supported that determination, as the trial court found that, despite the existence of a bond between the mother and the minor children, and despite the many services that had been provided to the mother over the years, she remained unable to serve as a safe, nurturing, and responsible parent who was capable of assuming the care of three children who all had special needs and who had suffered trauma while in her care, and further, the mother's continued involvement in the drug trade imperiled the safety and stability of the minor children.

Argued October 17, 2019—officially released January 13, 2020**

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of Hartford, Juvenile Matters, where the respondent father was defaulted for failure to appear; thereafter, the matters were tried to the court, *C. Taylor, J.*; judgments terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed*.

*Joshua Michtom*, assistant public defender, for the appellant (respondent mother).

*Rosemarie T. Weber*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Stein M. Helmrich*, for the minor children.

*Opinion*

ELGO, J. The respondent mother appeals from the judgments of the trial court terminating her parental rights as to Yolanda V., Jennessy V., and Hailey V., her minor children.[1] She contends that the court improperly concluded that (1) she failed to achieve the requisite degree of personal rehabilitation required by General Statutes § 17a-112, and (2) termination of her parental rights was in the best interests of the children.[2] We affirm the judgments of the trial court.

The following facts, which the trial court found by clear and convincing evidence,[3] are relevant to this appeal. The respondent is a convicted felon and drug trafficker who has a history of substance abuse, domestic violence, and mental health issues. She has been diagnosed with depression, anxiety, post-traumatic stress disorder, mood disorder, and bipolar disorder.

As the court noted in its memorandum of decision, the Department of Children and Families (department) "has been involved with [the respondent and her family] since 2002, due to issues of domestic violence, substance abuse, mental health, parenting issues, physical neglect, and physical abuse." In 2002, the respondent's two older children, Malaysha R. and Damion B., were removed from her care following her arrest on drug related charges and subsequent incarceration. Their guardianship ultimately was transferred to a relative, and efforts to reunify them with the respondent were unsuccessful.

Yolanda was born in 2006, and was twelve years old at the time of trial. She has "significant special needs," having been diagnosed with autism spectrum disorder and attention deficit hyperactivity disorder (ADHD). Jennessy was eleven years old at the time of trial and suffers from ADHD, post-traumatic stress disorder, and multiple learning disorders. Hailey was ten years old at the time of trial and has been diagnosed with ADHD, multiple learning disorders, and pica.[4]

On January 25, 2010, Hailey sustained a cut to her forehead. The department received a report from emergency medical technicians who responded to a 911 call, who "did not feel that the coffee table, that [the respondent] reported the child had hit, had sharp enough edges to inflict such injury." Although a subsequent investigation concluded that there was insufficient evidence to substantiate the allegations of physical abuse, the case remained open and ongoing services continued.

On May 24, 2010, the department received a report from a teacher concerned by red sores on Yolanda's hands because Yolanda "had made statements accusing [the respondent of] hitting her." The department ultimately could not substantiate those allegations.

On February 16, 2011, the department received a

report of emotional neglect stemming from a physical and verbal altercation between the respondent and the father, which later was substantiated. As the court recounted in its memorandum of decision: "The caller stated that police went to the home and learned that [the respondent] and [the father] had a physical and verbal altercation. According to the caller, this occurred quite often. The caller stated that there were holes all over the walls and the caller was unsure if they were from both parties. There was spaghetti splattered over the wall. There were numerous items broken in the home from past fights which were never reported. [The father] had injuries. According to the caller, both parties were hitting each other. However, [the respondent] did not have any visible injuries. The children were present but not injured. The caller stated that the children were 'scared out of their minds.' The caller stated that neighbors heard the children screaming. The two older children told the caller that 'mommy and daddy fight all the time.' Both parents were arrested. [The respondent] was charged with assault in the third degree, disorderly conduct, and interfering. [The father] was charged with disorderly conduct and interfering. Both parties remained in police custody. The children remained at the home with a relative. The allegations were substantiated and the case was transferred to ongoing services. The children entered care at this time."[5]

The minor children thereafter were adjudicated neglected and committed to the custody of the petitioner, the Commissioner of Children and Families, on November 10, 2011. At that time, the court issued specific steps for both the respondent and the father. Following the implementation of services by the department, the court returned custody of the children to the respondent on September 18, 2012, approximately one and one-half years after the neglect petitions had been filed.

The department nevertheless continued to receive reports concerning the respondent and her family. As the court found: "On June 23, 2014, [the department] received a report from [the Community Health Center], alleging reported physical neglect of the children by [the respondent]. . . . The caller, who had done an intake, expressed concerns regarding [the respondent's] substance abuse issues. [The respondent] tested positive for phencyclidine (PCP),[6] marijuana, and cocaine. The caller confronted [the respondent] with the results [and the respondent] did not deny using illicit substances . . . .

"[In-Home Child and Adolescent Psychiatric Services][7] had been working with the family since September, 2015. . . . The caller indicated that [that provider] had difficulty in reaching [the respondent] for six weeks and had difficulty in meeting with the family to provide necessary clinical services. The program was supposed

to meet with Hailey three times per week, but [the respondent] had failed to make her available for at least three weeks. . . .

"On March 4, 2016, [the department] received a report from [the children's elementary school] alleging physical neglect of Yolanda, Jennessy, and Hailey by [the respondent]. The caller reported that the children had chronic lice . . . . After [the department] investigated, the lice issue with the children was resolved and the case was submitted for closure with the children engaged in services at [the Village for Families and Children] and [Wheeler Center] Care Coordination.

"On May 10, 2016, [the department] received a report from [the Village for Families and Children] stating that the family appeared that evening for their medication management appointment. [The respondent] reported that her [former boyfriend] broke into the home and strangled Yolanda the night before. None of the children awoke [the respondent]. [The respondent] learned of this right before the appointment that night. Yolanda told [the respondent] that [the former boyfriend] 'choked' her. Jennessy told [the respondent that] she heard her sister screaming and saw the man choking her sister. Jennessy also reported she heard glass breaking. [The respondent's] car window was in fact broken. [The respondent] did not report this to police. The caller indicated that he/she encouraged [the respondent] to call the police. The children stated they did not go to [the respondent] because they were scared and [she was] sleeping. The allegations of physical neglect regarding Yolanda, Jennessy, and Hailey were substantiated against [the respondent] due to circumstances injurious to the children's well-being.

"[The department] concluded that [the respondent] was actively using PCP and marijuana while caring for her children. She presented with erratic thoughts and paranoia, which appeared to be a direct result of her PCP usage and unaddressed mental health. The children did not appear to be aware of [the respondent's] substance abuse, however, her usage and unaddressed mental health impacted her ability to parent and protect the children appropriately. The allegation of emotional neglect was substantiated on behalf of the children as the children reported being scared of burglaries to their home. [The respondent's] erratic and paranoid behavior created an emotional impact on the children, as they became fearful to reside in their home and were noted to have difficulty sleeping. The case was transferred for ongoing services. [The respondent] continued to work with [Wheeler Center] to address her substance abuse and mental health, as well as the children's mental health services at [the Village for Families and Children]. . . . [Intensive Family Preservation] services were put in place to assist [the respondent] . . . in improving and strengthening family functioning."

(Footnotes added.)

On October 19, 2017, the respondent attempted to commit suicide. She was transported by ambulance to the hospital with Yolanda at her side. Hospital officials contacted the department that day to report allegations of physical neglect of the minor children, which the department later substantiated.

The petitioner initiated a ninety-six hour hold on the minor children on October 20, 2017, and the trial court issued an order of temporary custody days later.[8] The department thereafter filed a neglect petition on behalf of the minor children, alleging, inter alia, that they were being denied proper care and attention and that they were being permitted to live under conditions injurious to their well-being. On January 25, 2018, the respondent appeared in court and entered a plea of nolo contendere to the injurious conditions allegation. As a result, the minor children were adjudicated neglected and committed to the custody of the petitioner. At that time, the court issued specific steps which the respondent signed.[9] The court also ordered the respondent to submit to a hair test. All three segments of that test later came back positive for PCP.

On August 13, 2018, the petitioner filed petitions to terminate the respondent's parental rights predicated on her failure to achieve sufficient rehabilitation pursuant to § 17a-112 (j) (3) (B) (i).[10] In response, the respondent denied the substance of those allegations.

A two day trial on the termination petitions was held in January, 2019, at which the parties submitted documentary and testimonial evidence. On March 18, 2019, the court issued its memorandum of decision, in which the court granted the petitions to terminate the respondent's parental rights. In so doing, the court made extensive findings of fact and concluded that the petitioner had established that the adjudicatory ground for termination existed and that termination was in the best interests of the minor children. From those judgments, the respondent now appeals.

I

The respondent first claims that there was insufficient evidence for the trial court to find by clear and convincing evidence that she had failed to achieve the degree of personal rehabilitation required by § 17a-112. More specifically, the respondent argues that, although she "was not fully compliant with all specific steps, her noncompliance occurred largely at the beginning of the case, and was followed by an eight month period of compliance immediately preceding" her January, 2019 trial.[11] We do not agree.

The legal principles that govern our review are well established. Pursuant to § 17a-112, "[t]he trial court is required . . . to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child.

and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . Rehabilitate means to restore [a parent] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when [she] will be able to assume a responsible position in [her] child's life. Nor does it require [her] to prove that [she] will be able to assume full responsibility for [her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a responsible position in [her] child's life. . . . In addition, [i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department. . . .

"When a child is taken into the commissioner's custody, a trial court must issue specific steps to a parent as to what should be done to facilitate reunification and prevent termination of parental rights." (Citations omitted; internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 585–86, 122 A.3d 1247 (2015). "Specific steps provide notice and guidance to a parent as to what should be done to facilitate reunification and prevent termination of rights. Their completion or noncompletion, however, does not guarantee any outcome. A parent may complete all of the specific steps and still be found to have failed to rehabilitate. . . . Conversely, a parent could fall somewhat short in completing the ordered steps, but still be found to have achieved sufficient progress so as to preclude a termination of his or her rights based on a failure to rehabilitate." (Citation omitted; internal quotation marks omitted.) *In re Elvin G.*, 310 Conn. 485, 507–508, 78 A.3d 797 (2013). "[I]n assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) *In re Luciano B.*, 129 Conn. App. 449, 476, 21 A.3d 858 (2011).

Appellate review of the trial court's determination that a parent has failed to achieve the required degree of rehabilitation is a matter of evidential sufficiency. As our Supreme Court has explained, "[w]hile . . . clear error review is appropriate for the trial court's subordinate factual findings . . . the trial court's ultimate conclusion of whether a parent has failed to rehabilitate involves a different exercise by the trial court. A conclusion of failure to rehabilitate is drawn from *both* the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in

§ 17a-112 (j) (3) (B). Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Emphasis in original; footnote omitted; internal quotation marks omitted.) *In re Shane M.*, supra, 318 Conn. 587–88. "In other words, [i]f the [trial court] could reasonably have reached its conclusion, the [judgment] must stand, even if this court disagrees with it." (Internal quotation marks omitted.) *In re Jayce O.*, 323 Conn. 690, 716, 150 A.3d 640 (2016).

"An important corollary to these principles is that the mere existence in the record of evidence that would support a *different* conclusion, without more, is not sufficient to undermine the finding of the trial court. Our focus in conducting a review for evidentiary sufficiency is not on the question of whether there exists support for a different finding—the proper inquiry is whether there is *enough* evidence in the record to support the finding that the trial court made." (Emphasis in original.) Id.

We begin our analysis by noting what is not in dispute. The record before us contains ample evidence of the respondent's involvement with the department since 2002, when her eldest children were removed from her care. The evidence further demonstrates that the respondent has been provided numerous services over the years to address her substance abuse, mental health, domestic violence, and parenting issues. The respondent also does not contest the court's findings in its memorandum of decision that she failed to comply with the specific steps ordered by the court following the removal of her minor children in October, 2017, including (1) testing positive for marijuana and PCP on October 25, 2017, (2) testing positive for PCP on February 6, 2018, (3) failing to submit to drug testing between March 16 and June 18, 2018, (4) failing to consistently attend mental health appointments, and (5) failing to consistently attend medication management meetings. Those findings are supported by the evidence in the record before us.

The record also indicates that the minor children have been removed from the respondent's care and adjudicated neglected on two separate occasions in 2011 and 2017, respectively—the first precipitated by a domestic violence altercation that left the children " 'scared out of their minds' " and the second following the respondent's suicide attempt. As a result, the children spent approximately two and one-half years in foster care due to those removals.

The respondent also does not dispute that, under our rules of practice and decisional law, the critical date in assessing rehabilitation efforts is the date that the termination petition is filed. See Practice Book § 35a-7 (a) (trial court generally "is limited to evidence of events preceding the filing of the petition or the latest amendment" in adjudicatory phase of termination proceeding); see also *In re Cameron W.*, 194 Conn. App. 633, 645–46,     A.3d     (2019) ("in the adjudicatory phase, [the court] was limited to making its assessment on the basis of facts preceding the filing of the petition for termination of parental rights or the latest amendment thereto"). At the same time, our law recognizes that, in the rehabilitation context, "the court *may* rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original; internal quotation marks omitted.) *In re Jennifer W.*, 75 Conn. App. 485, 495, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003). This court has thus held that "the [trial] court [retains] discretion . . . to consider events and behavior that occurred after the filing of the [termination] petition to determine if the respondent had failed to achieve sufficient personal rehabilitation to allow her to assume a responsible position in her children's lives." Id. In the present case, the court exercised that discretion and expressly considered evidence of the respondent's conduct following the filing of the termination petitions in its memorandum of decision.

In light of the foregoing, the respondent argues in her principal appellate brief that she was "compliant" with the court-ordered specific steps "for the eight and one-half months immediately preceding the trial (June, 2018—January, 2019)."[12] The evidence in the record belies that assertion.

The specific steps required the respondent to "[s]ubmit to random drug testing; the time and method of the testing will be up to [the department] to decide." In its memorandum of decision, the court found that while the respondent complied with regularly scheduled testing, she did "not comply with the unscheduled random toxicology screenings." That finding is supported by the evidence at trial, which indicates that the respondent failed to submit to "random urine screenings" on October 15, November 5, November 7, November 13, November 16, and November 27, 2018.

The specific steps also required the respondent to "[n]ot get involved with the criminal justice system." The respondent concedes, and the record confirms, that she was arrested on August 9, 2018, for selling twenty-seven bags of fentanyl-laced heroin to an undercover police officer. The respondent did not report that arrest

to the department. On November 28, 2018, the respondent was convicted of one count of possession of a controlled substance in violation of General Statutes § 21a-279 (a) (1), one count of interfering with an officer in violation of General Statutes § 53a-167a, and one count of criminal trespass in the first degree in violation of General Statutes § 53a-107.[13]

Furthermore, the specific steps obligated the respondent to secure "a legal income." The evidence in the record plainly indicates that the respondent did not comply therewith. The specific steps also required the respondent to "[k]eep all appointments set by or with" the department. The January 3, 2019 addendum to the social study that was admitted into evidence at trial states that the respondent had "missed three supervised visits with her children" since August 15, 2018.[14] In light of the foregoing, the respondent's claim of compliance with the specific steps in the eight and one-half months prior to trial is untenable.

In addition, we note that, contrary to the contention of the respondent, the court acknowledged her compliance with certain steps and her completion of certain programs. As the court stated in its memorandum of decision, "[t]he credible evidence in this case clearly and convincingly shows that [the respondent] has undertaken some rehabilitative services. It has also been clearly and convincingly shown that she has completed some services." At the same time, the court also concluded that "it has . . . been clearly and convincingly shown that [the respondent], as shown by her conduct, has failed to benefit from such services."

In so doing, the court expressly relied on the precept that "[i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment . . . ." *In re Vincent D.*, 65 Conn. App. 658, 670, 783 A.2d 534 (2001). In its memorandum of decision, the court concluded that the substance abuse, mental health, and parenting issues that led to the initial commitment of the respondent's minor children continued to plague the respondent. The record substantiates that determination.

The evidence indicates that, although she completed substance abuse treatment that included an intensive outpatient program in late 2017, and the women in healing group in January, 2018, the respondent subsequently tested positive for PCP in February, 2018. Following that positive test, the evidence indicates that the respondent repeatedly refused to comply with random toxicology screenings. It also is undisputed that the respondent was arrested in 2018 for selling heroin and later convicted of possession of a controlled substance in violation of § 21a-279 (a) (1), months prior to trial on the termination petitions.

In addition, the evidence indicates that, in the months leading up to the filing of the petitions for termination of her parental rights, the respondent did not consistently attend mental health and medication management appointments following the commitment of her minor children. During certain periods of time in which her therapist and department officials were concerned that the respondent was not taking her prescribed medications, they observed her "as being easily agitated, overwhelmed, impatient and . . . not making sense at times." The respondent also did not accurately inform her therapist of the circumstances surrounding her August 9, 2018 arrest[15] or the fact that she was involved in a domestic violence incident in November, 2018.[16]

Furthermore, despite completing a Therapeutic Family Time program, the evidence submitted at trial substantiates the court's finding that the respondent missed three supervised visits with her children after the department filed the termination petitions on August 13, 2018.[17] The evidence also indicates that, when the respondent did attend supervised visits, she continued to have "difficulty managing" the minor children. Lourdes Burgos, an ongoing treatment worker with the department, testified that, when the minor children bickered with each other during supervised visits, the respondent "would seem agitated, overwhelm[ed], and would scream stop it . . . ." In this regard, we reiterate the undisputed fact that the minor children all have specialized needs including ADHD and, in Yolanda's case, autism spectrum disorder.

"[I]n assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) *In re Luciano B.*, supra, 129 Conn. App. 476. In evaluating the respondent's rehabilitation efforts, the court understandably was mindful of those specialized needs of the minor children. The court also properly considered the respondent's history with the department since 2002. See id., 477 (rejecting claim that court "improperly considered [the respondent mother's] past history" in making rehabilitation assessment); *In re Jennifer W.*, supra, 75 Conn. App. 499 (explaining that trial court must make "an inquiry into the *full* history of the respondent's parenting abilities" [emphasis in original]). In addition, the court properly considered the respondent's history and unsuccessful attempts at reunification with her older children. See *In re Dylan C.*, 126 Conn. App. 71, 82, 10 A.3d 100 (2011) (court examined respondent mother's history with her other children "to gain perspective on the respondent's child caring and parenting abilities").

Construing the record before us in the manner most favorable to sustaining the judgments of the trial court,

as we are obligated to do; see *In re Shane M.*, supra, 318 Conn. 588; we conclude that it contains sufficient evidence for the court to conclude that the respondent had not corrected several of the factors that led to the initial commitment of her minor children. That evidence supports the court's determination that the respondent failed to attain that degree of rehabilitation sufficient to warrant the belief that at some time in the foreseeable future, she would be capable of assuming a responsible position with respect to the care of her children.

## II

The respondent also challenges the court's finding that the termination of her parental rights was in the best interests of the minor children. She claims that the court's finding lacks an evidentiary basis and, thus, is clearly erroneous. We disagree.

Connecticut's appellate courts will not disturb a trial court's best interests finding unless it is clearly erroneous. See *In re Brayden E.-H.*, 309 Conn. 642, 657, 72 A.3d 1083 (2013). "A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 488, 940 A.2d 733 (2008).

In the dispositional portion of its memorandum of decision, the court emphasized the family's history with the department, noting that the present litigation "marks the second removal [of the minor children] from [the respondent's] home . . . ." The court expressly considered the seven statutory factors prescribed by § 17a-112 (k) and made findings with respect thereto.[18] The court then considered the respondent's ability to provide stability and proper care for the minor children, who all have special needs. In this regard, the court found that "[t]he clear and convincing evidence also shows that [the respondent] has been placed on notice to address her issues in the past. . . . The evidence . . . clearly and convincingly shows that she is incapable of being a safe, nurturing, and responsible parent for her daughters. [The respondent] is obviously unable to care for Yolanda, Jennessy, and Hailey appropriately and to provide them with the safety, care, permanence, and stability that the children need and deserve."

More specifically, the court found that the respondent had "numerous issues that are clearly antithetical to safe, responsible, and nurturing parenting, and are also antagonistic to [the minor children's] best interests." The court noted the respondent's history of substance abuse, which continued after the removal of the minor children from her home as reflected by her positive tests[19] and her refusal to submit to random drug testing.

In addition, the court was mindful of the respondent's criminal history, noting that she is "a convicted felon and drug trafficker" who previously had been incarcerated.[20] In light of that criminal history, the court found especially troubling the respondent's "continued involvement in serious criminal behavior" following the commitment of her minor children. As the court stated: "The petitioner put on evidence to clearly and convincingly show that [the respondent] did sell a quantity of narcotics, specifically heroin laced with fentanyl, to an undercover officer on August 9, 2018 . . . . Additionally, it was further shown that, when [the respondent] was arrested shortly thereafter, she was in possession of the buy money that she had received from the undercover officer . . . and twenty-seven bags of heroin laced with fentanyl, identical to the bags sold to the undercover officer. Trafficking in narcotics is an occupation fraught with danger and peril. These risks are things that [the respondent], a convicted drug trafficker prior to August 9, 2018, would be expected to be acquainted with. Unfortunately, these dangers and risks would have to be shared with any young and dependent children who shared [the respondent's] home and life." We agree with the trial court that the respondent's continued involvement in the drug trade bore directly on her ability to provide safety and stability to the minor children, irrespective of whether her criminal conviction resulted in incarceration.[21] We thus reject the respondent's assertion that the court "failed to articulate how [her] conviction . . . affected her parenting ability." Moreover, the evidence of the respondent's continued involvement in the drug trade substantiates the court's finding that the respondent's "individual judgment and conduct still remain questionable," despite being provided a litany of services by the department over the course of many years.

The court also credited evidence submitted at trial indicating that the respondent had shown little improvement in her parenting abilities. As the court found, the respondent's referrals to parenting programs "have failed to increase her abilities to manage her children's behaviors and their special needs. The reports from her supervised visitations and [the Therapeutic Family Time program] indicated that, despite services, [the respondent] had great difficulty in managing the children's behaviors during visits. The court is well aware and certainly sympathetic to the challenges that a care-

giver faces in raising three children with significant special needs. Nevertheless, it was [the respondent's] responsibility to place herself in a position where she could care for these children safely, responsibly, and in a nurturing manner. Unfortunately, she has been unable to accomplish this." That finding also is bolstered by the undisputed fact, which the court emphasized in its memorandum of decision, that the respondent "has no legal income" and that she missed multiple supervised visits with the minor children in the months prior to trial. See footnote 14 of this opinion.

On appeal, the respondent emphasizes that the court, in its memorandum of decision, found that the minor children had a bond with her. That finding is substantiated by the evidence in the record. It nonetheless is not dispositive. As this court has explained, the appellate courts of this state "consistently have held that even when there is a finding of a bond between [a] parent and a child, it still may be in the child's best interest to terminate parental rights." *In re Rachel J.*, 97 Conn. App. 748, 761, 905 A.2d 1271, cert. denied, 280 Conn. 941, 912 A.2d 476 (2006); see also *In re Melody L.*, 290 Conn. 131, 164, 962 A.2d 81 (2009) (same), overruled in part on other grounds by *State v. Elson*, 311 Conn. 726, 91 A.3d 862 (2014).

In the present case, the court found that, despite the existence of a bond and despite the many services that had been provided to her over the years, the respondent remained unable to serve as a "safe, nurturing, and responsible parent who is capable of assuming the care of Yolanda, Jennessy, and Hailey"—three children who all had special needs and who had suffered trauma while in her care.[22] The court further found that the respondent's continued involvement in the drug trade imperiled the safety and stability of the minor children. The court thus found that termination of the respondent's parental rights was in the best interests of the minor children, who needed permanency, continuity, and stability in their lives. Indulging every reasonable presumption in favor of the court's ruling as our standard of review requires; see *In re Davonta V.*, supra, 285 Conn. 488; we conclude that the evidence in the record supports that determination. That finding, therefore, is not clearly erroneous.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** January 13, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The court also terminated the parental rights of the minor children's father, whom we refer to by that designation. At trial, the father was defaulted due to his failure to appear. Because he has not appealed from the judgments of the trial court, we refer in this opinion to the respondent mother as

the respondent.

[2] We note that the attorney for the minor children filed a statement in which he took no position with respect to the first claim and adopted the position of the respondent with respect to the second claim. That statement was filed two days prior to oral argument before this court, in contravention of Practice Book § 67-13, which requires such statements to be filed within ten days of the filing of the appellee's brief. In this case, the appellee filed its brief on August 7, 2019. The attorney for the minor children nonetheless did not file his statement with this court until October 15, 2019. Moreover, counsel for the appellee represented to this court at oral argument held on October 17, 2019, that she did not receive the attorney's statement until that very day. We remind the attorneys for minor children of their obligation to comply with the rules of practice in this state.

[3] In this appeal, the respondent concedes that the court's factual findings are supported by evidence in the record before us and does not challenge those findings as clearly erroneous.

[4] "Pica is a symptom of a neurological or psychiatric disorder, which is usually only found in children and is manifested by the ingestion of non-nutritive substances, such as large quantities of dirt." *Caro* v. *Woodford*, 280 F.3d 1247, 1252 n.2 (9th Cir. 2002), cert. denied, 536 U.S. 951, 122 S. Ct. 2645, 153 L. Ed. 2d 823 (2002).

[5] The record indicates that the department invoked a ninety-six hour hold on the minor children on March 25, 2011, and filed neglect petitions on their behalf days later.

[6] "[P]hencyclidine (PCP) is a street drug that induces psychotic behavior." *State* v. *Washington*, 155 Conn. App. 582, 588 n.3, 110 A.3d 493 (2015). It is "defined as a piperidine derivative $C_{17}H_{25}N$ used chiefly in the form of its hydrochloride [especially] as a veterinary anesthetic and sometimes illicitly as a psychedelic drug . . . ." (Internal quotation marks omitted.) *State* v. *Reddick*, 153 Conn. App. 69, 71 n.1, 100 A.3d 439, appeal dismissed, 314 Conn. 934, 102 A.3d 85, cert. denied, 315 Conn. 904, 104 A.3d 757 (2014).

[7] Intensive In-Home Child and Adolescent Psychiatric Services, known also as IICAPS, "provides home-based treatment to children, youth and families in their homes and communities. Services are provided by a clinical team which includes a [m]aster's-level clinician and a [b]achelor's-level mental health counselor. The clinical team is supported by a clinical supervisor and a child & adolescent psychiatrist. IICAPS Services are typically delivered for an average of [six] months. IICAPS staff also provide [twenty-four hour]/[seven day] emergency crisis response." (Internal quotation marks omitted.) *Matthew C.* v. *Commissioner of Children & Families*, 188 Conn. App. 687, 706–707 n.10, 205 A.3d 688 (2019).

[8] It is undisputed that this was the second removal of the minor children in the span of six years. At that time, the minor children were placed in a relative foster home, where they since have remained.

[9] The specific steps issued on January 25, 2018, required, among other things, the respondent to (1) "[k]eep all appointments set by or with" the department, (2) "[s]ubmit to random drug testing", (3) "[n]ot use illegal drugs", (4) "[g]et and/or maintain . . . a legal income", (5) "[n]ot get involved with the criminal justice system", and (6) [l]earn to take care of the children's physical, educational, medical or emotional needs, including keeping [their] appointments with [their] . . . providers."

[10] General Statutes § 17a-112 (j) (3) (B) (i) provides in relevant part: "The Superior Court . . . may grant a petition [to terminate parental rights] . . . if it finds by clear and convincing evidence that . . . the child . . . has been found by the Superior Court . . . to have been neglected . . . in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[11] The respondent also complains that the trial judge utilized "identical language" in its memorandum of decision that also appears in other published decisions. The language in question is contained in but a few paragraphs of the court's comprehensive seventy-seven page memorandum of decision. Moreover, the respondent has not distinctly briefed any claim of error with respect thereto, stating that she "does not here argue that this duplicate language constitutes an abuse of discretion." Instead, she suggests that the court's use of that language is an indication that the court did not "adequately [weigh] the facts before it." On our thorough review of the

court's memorandum of decision in light of the record before us, we conclude that her contention is without merit.

[12] The respondent further argues that the record reflects "substantial compliance" with the specific steps on her part in the months prior to trial. Apart from the factual inaccuracy of that statement, it reflects a misunderstanding of the applicable principles that govern the rehabilitation determination. "[A] finding of rehabilitation is not based on a mechanistic tabulation of whether a parent has undertaken specific steps ordered." *In re Destiny R.*, 134 Conn. App. 625, 627, 39 A.3d 727, cert. denied, 304 Conn. 932, 43 A.3d 660 (2012). Rather, the ultimate issue is whether the parent has gained the insight and ability to care for her children, given their ages and needs, within a reasonable time. See *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873 (1999). For that reason, this court previously has rejected the claim that a respondent's "substantial compliance" with specific steps precludes the trial court from terminating her parental rights. *In re Coby C.*, 107 Conn. App. 395, 400–406, 945 A.2d 529 (2008).

[13] A certified copy of the respondent's criminal conviction record was admitted into evidence at trial. That document indicates that the respondent received a suspended sentence with three years of probation for those offenses.

[14] In its memorandum of decision, the court found that the respondent "failed to visit her [minor] children on August 15, 2018, September 5, 2018, and September 26, 2018."

[15] The respondent's mental health therapist, Jordan Wasik, testified at trial as follows:

"[The Petitioner's Counsel]: [W]hat did she tell you about her arrest in August of 2018?

"[Wasik]: She had said that she was in the wrong place at the wrong time and that [what] was reported was incorrect.

"[The Petitioner's Counsel]: Okay. So if you were to learn that [the respondent] was arrested for selling fentanyl-laced heroin to an undercover officer in August of 2018, would that be consistent with what she shared with you?

"[Wasik]: No.

"[The Petitioner's Counsel]: Okay. And if you also learned that she had— was found to have [twenty-seven] bags of fentanyl-laced heroin on her person, would that be consistent with what she shared with you?

"[Wasik]: No.

"[The Petitioner's Counsel]: Okay. Would those facts, if you knew them in August of 2018, be concerning to you in terms of [the respondent's] either substance abuse status or mental health status?

"[Wasik]: Yes."

[16] A printout of a November 23, 2018 Facebook post from the respondent was admitted into evidence at trial. In that post, the respondent recounted in graphic detail an incident that transpired on Thanksgiving night in which she was threatened with a weapon and was the victim of an attempted rape. Approximately one week after that message was posted, her social worker observed bruising on the respondent's lower jaw. That evidence supports the court's finding that the respondent was involved in a domestic violence incident that Thanksgiving.

At trial, Jordan Wasik, the respondent's therapist, testified that the respondent had not informed her of that incident. Wasik further testified that, if the respondent had shared that information, she would have been concerned about the respondent's understanding of healthy relationships.

[17] See footnote 14 of this opinion.

[18] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent

has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[19] The court found, and the record confirms, that the respondent tested positive for marijuana and PCP on October 25, 2017, and tested positive for PCP on February 6, 2018.

[20] The certified copy of the respondent's criminal conviction record that was admitted into evidence at trial indicates that the respondent's criminal history includes a 2002 conviction for the possession of a controlled substance with intent to sell in violation of General Statutes (Rev. to 2001) § 21a-277 (b).

[21] It is undisputed that the respondent received a suspended sentence and three years of probation for her November 28, 2018 conviction of one count of possession of a controlled substance, one count of interfering with an officer, and one count of criminal trespass in the first degree, as reflected in the certified copy of the respondent's criminal conviction record that was admitted into evidence at trial.

[22] Among the traumatic incidents documented in the record are the respondent's attempted suicide, the strangulation of Yolanda in their home by the respondent's former boyfriend, and the domestic violence incident that precipitated their first removal from the respondent's care and left the children " 'scared out of their minds.' "