******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE A'VION A. ET AL.*
## (AC 45357)

Elgo, Cradle and Clark, Js.

*Syllabus*

The respondent mother appealed to this court from the judgments of the trial court terminating her parental rights with respect to her minor children, A, L, and Z. She claimed that the trial court improperly denied her motion to compel the Department of Children and Families to provide additional reunification services to her, improperly concluded that she had failed to achieve the requisite degree of personal rehabilitation required by statute (§ 17a-112 (j) (3) (B)) with respect to Z, and erroneously determined that the department made reasonable efforts at reunification pursuant to § 17a-112 (j) (1), which requires a trial court to find by clear and convincing evidence that the department made reasonable efforts to reunify a parent and children unless it finds, instead, that the parent is unable or unwilling to benefit from such efforts. The trial court found, pursuant to § 17a-112 (j) (1), that the mother also was unwilling or unable to benefit from reunification efforts. *Held*:

1. The trial court did not abuse its discretion in denying the respondent mother's motion to compel the department to provide additional reunification services: it was within the court's discretion to make decisions relating to its case management authority and it was not improper for the court to have predicated its decision on the fact that the termination trial had been postponed months earlier and was scheduled to begin in eighteen days, more than two years after the children had been transferred to the custody of the petitioner, the Commissioner of Children and Families; moreover, because the adequacy of the department's efforts at reunification would have been an issue at the termination trial, the mother would have had the opportunity to present argument and evidence at that trial refuting the petitioner's claims that she was provided with appropriate reunification services or that she was unwilling or unable to benefit from them.

2. The respondent mother could not prevail on her claim that the trial court improperly concluded that she had failed to achieve the requisite degree of personal rehabilitation so as to encourage the belief that, within a reasonable time, she could assume a responsible position in the life of Z: record evidence supported the court's findings that the mother failed to fully comply with key portions of the court-ordered specific steps to facilitate her reunification with the minor children, including that she had refused to participate in certain services for which she had been referred, she had rescinded releases with some providers, she refused to cooperate with home visits by department workers, and she failed to properly notify the department of a change in her household when she subsequently became pregnant and gave birth to another child during the termination proceedings; moreover, the court also found that she continued to exhibit inappropriate behaviors during visits with the minor children, was argumentative and hostile with visitation supervisors and had not acknowledged her personal issues that had led to the removal of the children; furthermore, the mother failed to challenge the court's determination that she had not achieved the requisite degree of rehabilitation with respect to her older children.

3. This court concluded that the respondent mother's claim that the trial court improperly determined that the department made reasonable efforts to reunify her with the minor children was moot: because the mother did not challenge the trial court's finding that she was unable or unwilling to benefit from reunification efforts, but challenged only one of the two separate and independent bases for upholding the trial court's determination that the requirements of § 17a-112 (j) (1) had been satisfied, there existed a separate independent basis for upholding the court's determination, and, therefore, even if this court agreed with the mother's claim, there was no practical relief that could be afforded to her; accordingly, that portion of the appeal was dismissed as moot.

Argued October 3, 2022—officially released, January 12, 2023**

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of New Britain, Juvenile Matters, and tried to the court, *C. Taylor, J.*; judgments terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Appeal dismissed in part; affirmed.*

*Joshua Michtom*, assistant public defender, for the appellant (respondent mother).

*Chelsea Ruzzo*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Evan O'Roark*, assistant attorney general, for the appellee (petitioner).

*Opinion*

ELGO, J. The respondent mother appeals from the judgments of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating her parental rights as to A'vion, Aaliyah, and Azra, her minor children.[1] On appeal, the respondent claims that the court improperly (1) denied her October 2, 2019 motion to compel the Department of Children and Families (department) to provide additional reunification services, (2) concluded that she failed to achieve the requisite degree of personal rehabilitation required by General Statutes § 17a-112 (j) (3) (B) with respect to Azra, and (3) determined that the department made reasonable efforts to reunify her with the minor children pursuant to § 17a-112 (j) (1). We conclude that the appeal is moot as to the final claim and dismiss that portion of the appeal. We otherwise affirm the judgments of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of this appeal. The respondent is a convicted felon who has a variety of mental health issues. She has been diagnosed with bipolar disorder, recurrent depression, borderline personality disorder, and adult antisocial behaviors.

The respondent began a romantic relationship with the father in 2011, and they married in 2015. Both the respondent and the father have extensive histories of domestic violence incidents and violations of protective orders.

A'vion and Aaliyah were born in 2012 and are fraternal twins. On April 17, 2014, the department received a report of an incident involving the respondent and A'vion and Aaliyah. After the father left the family's home following a domestic altercation with the respondent, the respondent sent him a text message stating that she was holding a knife to A'vion; she then threatened to kill A'vion and Aaliyah if he did not return. The respondent at that time also slashed the couches in the home. Police responded and arrested the respondent for threatening A'vion and Aaliyah with a knife.

Following that incident, A'vion and Aaliyah were adjudicated neglected and placed under an order of protective supervision, which was allowed to expire in June, 2016. The department referred the respondent to two parenting programs and an individual therapy and medication management program, which she completed. The respondent also participated in a psychological evaluation conducted by Bruce Freedman, a licensed psychologist. In his written evaluation, Freedman stated that the respondent's "history of fighting and assaults, her inadequately treated psychological problems, her early maladjustment, and her failure to accept court restriction on her behavior all are factors associated with a high probability of future aggressive

behavior." Between May 5, 2014, and February 24, 2016, the respondent was arrested for threatening to kill her mother, creating a public disturbance, and violating a protective order on multiple occasions that had been issued to protect the father.

On May 11, 2017, the department received a report of physical neglect pertaining to A'vion and Aaliyah stemming from a motor vehicle accident in which the vehicle operated by the respondent struck another vehicle and then fled the scene. The police later located the respondent's vehicle and confirmed that, although A'vion and Aaliyah were inside, the vehicle contained no booster seats for the children. The respondent, who at that time was seven and one-half months pregnant, refused a request by the police to have the children evaluated for injuries.

On May 18, 2017, the department received another report alleging physical abuse of A'vion by the respondent. A bystander witnessed the respondent strike A'vion on the back of the head, causing him to fall to the sidewalk. The bystander flagged down a police officer, who found the respondent to be uncooperative with his investigation and expressed concern about the respondent's use of profanity around the child. Although the allegations of physical abuse were unsubstantiated, the case was transferred to ongoing services with the department. Azra was born several weeks later.

On October 3, 2017, the department received a report from school officials of facial injuries to A'vion, which A'vion indicated were caused when the respondent struck him in the face. Although the respondent denied any involvement in causing those injuries and blamed a teenage babysitter,[2] Aaliyah subsequently confirmed that the respondent had hit A'vion in the face with a boot. In response, the department initiated a ninety-six hour hold on behalf of the minor children.

The next day, A'vion and Aaliyah were evaluated by Rebecca Moles, a pediatrician at Connecticut Children's Medical Center, who was admitted without objection at trial as an expert in child abuse pediatrics. Moles opined that the injuries to A'vion's face were "highly suspicious for inflicted injury." Moles also observed bruising on Aaliyah's forehead and linear scars on her back, which Moles opined were "suspicious for inflicted injury." The respondent later was arrested and pleaded guilty to risk of injury to a child in violation of General Statutes § 53-21 with respect to the injuries sustained by A'vion.

On October 6, 2017, the petitioner applied for and secured an order of temporary custody for all three minor children, which was sustained on October 13, 2017. The minor children thereafter were adjudicated neglected and were committed to the care and custody of the petitioner on January 11, 2018. At that time, the

court issued specific steps for the respondent to take to facilitate her reunification with the children, which the respondent signed.[3] The children subsequently disclosed additional details regarding the trauma they endured while in the respondent's care, including additional acts of physical violence and an incident in which A'vion and Aaliyah had soiled themselves and "were so afraid that they were going to get beat[en]" by the respondent that they ate their own feces.

On March 27, 2019, the petitioner filed petitions to terminate the respondent's parental rights predicated on her failure to achieve a sufficient degree of personal rehabilitation pursuant to § 17a-112 (j) (3) (B). In response, the respondent denied the substance of those allegations and filed a motion to revoke the commitment of the minor children.[4] A trial on the termination petitions was held over the course of ten days on various dates in 2021, at which the parties submitted documentary and testimonial evidence. On December 28, 2021, the court issued its memorandum of decision, in which it granted the petitions to terminate the respondent's parental rights. In so doing, the court made extensive findings of fact and concluded that the petitioner had established that the adjudicatory grounds for termination existed and that termination was in the best interests of the minor children. From those judgments, the respondent now appeals.

Before turning to the respondent's claims, we first set forth the legal principles that govern our review. "Proceedings to terminate parental rights are governed by § 17a-112. . . . Under [that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. The [petitioner] . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . Subdivision (3) of § 17a-112 (j) carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun." (Internal quotation marks omitted.) *In re Tresin J.*, 334 Conn. 314, 322–23, 222 A.3d 83 (2019).

Section 17a-112 (j) provides in relevant part: "The Superior Court, upon notice and hearing . . . may grant a petition . . . if it finds by clear and convincing evidence that (1) the [department] has made reasonable efforts to locate the parent and to reunify the child with

the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding, or (ii) is found to be neglected, abused or uncared for and has been in the custody of the [petitioner] for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

I

The respondent first claims that the court improperly denied her motion to compel the department to provide additional reunification services. We do not agree.

The following additional facts are relevant to the respondent's claim. After securing an order of temporary custody for the minor children in October, 2017, the department provided the respondent with a variety of mental health resources, parenting education resources, intensive family preservation services, anger management and domestic violence services, and psychological evaluations. The petitioner subsequently filed petitions to terminate the respondent's parental rights on March 27, 2019. The department thereafter continued to provide services to the respondent to facilitate her reunification with the minor children, including domestic violence treatment and supervised visitation services.

On May 20, 2019, the petitioner filed a motion for review of the permanency plan, in which she sought approval of the proposed plan of termination and adoption of the minor children and a finding that the department made reasonable efforts to achieve that plan.[5] The respondent filed an objection, in which she contested the issue of whether the department had made reasonable efforts at reunification. The trial court then conducted an evidentiary hearing in accordance with General Statutes § 46b-129 (k) (1) (A), at which department worker Kaylee Cordero testified and counsel presented argument. At the conclusion of that hearing, the trial court found on the record that the department had made reasonable efforts and ordered the respondent to sign releases necessary for certain referrals. The permanency plan ultimately was approved by the trial court.

Although the termination trial was scheduled to begin in June, 2019, the parties agreed to a postponement so that Freedman could conduct an updated

psychological evaluation of the respondent. Freedman completed that evaluation and submitted his report to the court in August, 2019. In that report, Freedman noted that the respondent had "continued to visit her children. The visits have gone reasonably well for the most part, although [the respondent] is sometimes cold to the children, other times gets angry with them for normal child behaviors, and has repeatedly made inappropriate comments." During that evaluation, the respondent admitted that she did not have much patience with the minor children, that she would become agitated and lose her temper with them, that she used too much physical discipline, and that she had struck the children on their heads. With respect to her current psychological functioning, Freedman stated that the respondent's "psychological testing during the current evaluation produces results similar to those from the previous evaluation. Her defensiveness, difficulty in acknowledging problems and tendency to say what sounds best are strong enough to render the psychological testing of little value." While Freedman indicated that he was "cautiously optimistic" about the respondent's potential for reunification, he did not endorse reunification or any particular permanency plan.

One of the referral questions asked Freedman to identify the types of services that he would recommend if the respondent lacked "the ability to meet the needs of her children given the trauma" that they had experienced. Freedman opined that the respondent "would need some parent coaching and family therapy to help her regain her children's trust, tolerate criticism and normal misbehavior from them." Freedman also was asked, "[i]f it is not recommended for the [minor children] to live with [the respondent] at this time, when might reunification be possible and what specific recommendations are made before reunification takes place?" In his report, Freedman did not answer the first part of that question as to when reunification would be possible. Instead, he stated: "*If* the court is inclined to consider reunification, it would be recommended that [the respondent and minor children] be referred to a reunification program." (Emphasis added.) Soon after receiving Freedman's updated evaluation, the department issued a referral for parent coaching services to the respondent.[6]

On October 2, 2019, the respondent filed a motion to compel the department to refer her for additional reunification services. The court held a hearing on that motion on October 17, 2019, at which the parties acknowledged that the previously postponed termination trial was scheduled to begin in eighteen days. At

that time, the court noted that an objection to the permanency plan had been filed and inquired whether that matter had been resolved. Counsel for the parties acknowledged that they had already had an evidentiary hearing in July, and the petitioner represented that the plan for termination and adoption had been approved. The parties then disputed whether the department had provided appropriate referrals following the filing of Freedman's updated evaluation and whether Freedman had recommended reunification services and in what context, and counsel for the petitioner raised concerns that the respondent had been involved in a recent domestic violence incident that would be addressed in the termination trial.[7] At the conclusion of that brief hearing, the court ruled on the respondent's motion from the bench, stating: "Based on what I've heard [and] in view of the fact that the [termination trial is scheduled] to start fairly soon [and] [a]lso in view of the age of the case, the motion to compel is denied." The respondent now challenges the propriety of that determination.

As a preliminary matter, we note that we are aware of no Connecticut authority in which a trial court has entertained a motion to compel additional reunification services by a respondent, particularly in light of the procedural backdrop of this case, nor has the respondent furnished any such authority. Here, the record indicates that the motion to compel was filed shortly before the termination of parental rights trial was scheduled to commence and followed an evidentiary hearing that was held two and one-half months earlier, which the trial court had scheduled pursuant to the respondent's objection to the court's finding that the department made reasonable efforts at reunification pursuant to § 46b-129 (k) (1) (A).

We also note that the parties disagree as to the applicable standard of review. The respondent maintains that our review of the court's decision to deny her motion to compel is plenary, as it implicates her constitutional rights and involves a purely legal determination.[8] The petitioner, by contrast, submits that a motion to compel the department to provide additional reunification services that is filed shortly before the commencement of trial is governed by a more deferential standard, as it implicates the court's case management authority and a variety of other factors, including the interests of the minor children, the age of the case, and the fact that the department's provision of reunification services and the respondent's ability to benefit from such services are issues subsumed in the litigation of the termination petition itself. Because the trial court is in a superior position to balance those factors, we agree with the petitioner that deference is warranted. See *Allstate Ins. Co.* v. *Palumbo*, 296 Conn. 253, 279, 994 A.2d 174 (2010) (*Rogers*, *C. J.*, concurring) ("we afford trial courts broad discretion to make determina-

tions requiring the balancing of multiple factors because trial courts are often in a better position to make this type of determination"). We therefore review the court's denial of the motion to compel for an abuse of discretion.

The transcript of the October 17, 2019 hearing on the respondent's motion to compel plainly indicates that the court's decision to deny that motion was predicated on the fact that the termination trial was scheduled to begin in eighteen days, which implicated the court's case management authority. As our Supreme Court has explained, "case management decisions [are reviewed] for abuse of discretion, giving [trial] courts wide latitude. . . . A party adversely affected by a [trial] court's case management decision thus bears a formidable burden in seeking reversal. . . . A trial court has the authority to manage cases before it as is necessary. . . . Deference is afforded to the trial court in making case management decisions because it is in a much better position to determine the effect that a particular procedure will have on both parties. . . . The case management authority is an inherent power necessarily vested in trial courts to manage their own affairs in order to achieve the expeditious disposition of cases." (Citations omitted; internal quotation marks omitted.) *Krevis* v. *Bridgeport*, 262 Conn. 813, 818–19, 817 A.2d 628 (2003).

With trial scheduled to begin in fewer than three weeks, the respondent's motion to compel the department to issue a referral and thereafter provide additional services was tantamount to a request for a continuance, which likewise is a matter entrusted to the discretion of the trial court.[9] See *In re Ivory W.*, 342 Conn. 692, 730, 271 A.3d 633 (2022). We further reiterate that the motion to compel also followed an evidentiary hearing held on July 23, 2019, pursuant to the respondent's objection to the petitioner's motion for review of permanency plan. Under § 46b-129 (k) (4) (E) and (F), the court is required to determine "the services to be provided to the parent *if the court approves a permanency plan of reunification* and the timetable for such services" and "whether the commissioner has made reasonable efforts to achieve the permanency plan." (Emphasis added.) Against that backdrop wherein the parties have already had the opportunity to litigate similar and/or overlapping issues and would be litigating those same issues, albeit under a higher standard of proof at the termination trial, the court properly could consider the impact that a further delay to the termination trial could have on the minor children. See *In re Ivory W.*, supra, 731 (concluding that "it was not unreasonable for the trial court to conclude that the interests of the children and the petitioner in having the matter resolved as soon as reasonably possible outweighed the respondent's interest in postponing the matter"); *In re Alexander V.*, 25 Conn. App.

741, 748, 596 A.2d 934 (1991) ("[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence" when resolving issues related to permanent care of neglected children), aff'd, 223 Conn. 557, 613 A.2d 780 (1992); *Burkett* v. *Arkansas Dept. of Human Services*, 507 S.W.3d 530, 534 (Ark. App. 2016) (trial court did not abuse discretion in denying father's motion to stay termination trial pending conclusion of related criminal proceedings because "a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances").

Moreover, because the adequacy of the department's efforts at reunification necessarily would be an issue at the termination trial scheduled to begin in eighteen days, the respondent remained free to present argument and evidence at the termination trial refuting the petitioner's claims that the respondent was provided appropriate reunification services or that she was unwilling or unable to benefit from them.

In its oral decision, the court also indicated that it had considered "the age of the case" in denying the respondent's motion to compel.[10] As this court has observed, the "statutory mandates [contained in General Statutes §§ 17a-110a, 17a-111a, 17a-111b, and 46b-129 (j) (6) (B)] . . . reflect the legislature's desire to shift the focus of juvenile proceedings from parental rights to the child's right to safety, stability, and permanency." *In re Adelina A.*, 169 Conn. App. 111, 122 n.14, 148 A.3d 621, cert. denied, 323 Conn. 949, 169 A.3d 792 (2016). Given the interests of the children "in having the matter resolved as soon as reasonably possible"; *In re Ivory W.*, supra, 342 Conn. 731; as well as other public policy concerns such as eligibility for federal funding for foster care in this state,[11] we cannot say that the court's consideration of the age of the case was improper in ruling on a motion to compel the department to provide additional reunification services.

In matters for which discretion is vested in the trial court, that court is "in a much better position to pass upon [the] question than we are." *State* v. *Laudano*, 74 Conn. 638, 646, 51 A. 860 (1902). Such is the case here, where the court exercised its discretion over the management of cases before it and balanced several factors in acting on the respondent's motion to compel. Moreover, the court's exercise of discretion occurred in the context of a statutory scheme that requires that the department and the court provide multiple, regular and timely opportunities for parents to be heard and to challenge the adequacy and propriety of the department's treatment plan and reunification services. See footnote 11 of this opinion; cf. *In re Tyqwane V.*, 85 Conn. App. 528, 541, 857 A.2d 963 (2004) (noting "the extensive nature of the judicial resources involved

throughout the termination process"). On the record before us, the court did not abuse its discretion in making the decision not to further delay a termination trial that had been postponed months earlier and was scheduled to begin more than two years after the children were transferred to the care of the petitioner. We therefore conclude that the respondent's challenge to the denial of her motion to compel is without merit.

## II

The respondent also claims that the court improperly concluded that she failed to achieve the requisite degree of personal rehabilitation required by § 17a-112 (j) (3) (B) with respect to Azra, the youngest of the minor children. We disagree.

Failure to achieve a sufficient degree of personal rehabilitation is one of the seven statutory grounds on which parental rights may be terminated under § 17a-112 (j) (3). Section § 17a-112 (j) permits a court to grant a petition to terminate parental rights "if it finds by clear and convincing evidence that . . . (3) . . . (B) the child . . . has been found by the Superior Court . . . to have been neglected . . . in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." In making that determination, "the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." *In re Danuael D.*, 51 Conn. App. 829, 840, 724 A.2d 546 (1999).

"We review the trial court's subordinate factual findings for clear error,[12] and review its finding that the respondent failed to rehabilitate for evidentiary sufficiency. . . . In reviewing that ultimate finding for evidentiary sufficiency, we inquire whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . [I]t is not the function of this court to sit as the [fact finder] when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the [judgment of the trial court] . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the [judgment] of which it is reasonably capable. . . . In other words, [i]f the [trial court] could reasonably have reached its conclusion, the [judgment] must stand, even if this court

disagrees with it." (Citations omitted; footnote added; internal quotation marks omitted.) *In re Jayce O.*, 323 Conn. 690, 715–16, 150 A.3d 640 (2016). Applying that standard, we conclude that there is sufficient evidence in the record to support the trial court's finding that the respondent failed to achieve a sufficient degree of personal rehabilitation.

In its memorandum of decision, the court found that the respondent had "failed to fully comply with the key portions" of the specific steps ordered by the court to facilitate her reunification with the minor children. See *In re Devon B.*, 264 Conn. 572, 584, 825 A.2d 127 (2003) ("the failure to comply with specific steps ordered by the court typically weighs heavily in a termination proceeding"); *In re Jermaine S.*, 86 Conn. App. 819, 833, 863 A.2d 720 (respondent's failure to comply with specific steps supported finding that she failed to attain sufficient degree of rehabilitation), cert. denied, 273 Conn. 938, 875 A.2d 43 (2005). The court found, inter alia, that the respondent had refused to participate in certain services for which she had been referred; that she had rescinded her releases with some providers, which impaired the department's ability to monitor her progress; that she refused to cooperate with home visits by department workers; and that she failed to promptly notify the department of a change to her household when she became pregnant and subsequently gave birth to another child in March, 2020. Those findings are amply supported by the testimonial and documentary evidence in the record before us.

The court also found that the respondent continued to exhibit inappropriate behavior during visits with the minor children. The record substantiates that finding. Nordia Savage, an employee of Connecticut Youth Resources who provides supervised visitation services, testified at trial that the respondent would yell at the minor children during visits. Savage also testified that the respondent would become easily triggered by the children, leaving them terrified. As one example, Savage recounted a visit at a McDonald's restaurant when Savage asked A'vion and Aaliyah not to take refillable soda containers home with them. Savage testified that, when she explained to the respondent that the children had spilled soda in her car the previous week, the respondent "snapped at them." Savage testified that the children got "this terrified look in their eyes. . . . [They] started crying [and apologizing]. . . . [T]heir reaction made me feel like they didn't feel safe." Cordero similarly testified that the respondent "consistently" was "very critical" of the minor children during supervised visits. In his updated psychological evaluation, Freedman similarly noted that, although the respondent's visits with the children "have gone reasonably well . . . [the respondent] is sometimes cold to the children, other times gets angry with them for normal child behaviors, and has repeatedly made inappropriate com-

ments [including] criticism of the foster care [family] and [the department], promises for reunification and a trip to Disney." Moreover, the court credited evidence that, during a visit in December, 2018, Azra was "extremely upset" and "cried for most of the two hour visit, but [the respondent] did not attempt to console her. Instead, [the respondent] yelled at Azra to stop crying several times."

The court further found, and the evidence indicates, that the respondent frequently became argumentative and hostile with visit supervisors. During one visit, a supervisor encouraged the respondent to participate in Azra's potty training. As visitation worker Alexandria Szantyr testified, the respondent was not receptive to that advice and "in a very aggressive tone [she] told me that she was not going to kiss anybody's butt to get her children back and that she did not want to participate in Azra's potty training." When asked what type of language the respondent had used, Szantyr testified that the respondent would "use vulgar language [and was] very aggressive, very hostile. She will curse at me. . . . [I]t was very argumentative . . . when it came to feedback."

Significantly, the court also found that the respondent had not acknowledged her own personal issues that led to the removal of her minor children and was "unable to acknowledge any wrongdoing" with respect to her own conduct. See *In re Vincent D.*, 65 Conn. App. 658, 670, 783 A.2d 534 (2001) ("[i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment"). The court specifically noted an incident that transpired during a supervised visit with Azra at a restaurant on December 13, 2019, as to which the court heard uncontroverted testimony at trial. During that visit, Azra had an accident that required a diaper change and left her "soaking wet from the urine." The respondent admonished Azra, who was two years old at the time, and began "huffing and puffing" about her accident. Although the respondent had been instructed to bring supplies for Azra during visits, she failed to bring a change of clothes for the child. As a result, Szantyr wrapped Azra in a cardigan that Szantyr had been wearing. Szantyr then brought up the issue of accountability with the respondent. The respondent asked what accountability had to do with parenting, and Szantyr explained that it pertained to the respondent's "role [in] what has happened with the children." The respondent became extremely upset and stated: "I don't understand what this has to do with anything. . . . I don't need to do [any of] this . . . ." Although Szantyr told the respondent that she needed her to "calm down" and "bring [her] tone down," the respondent was "adamant" that she did not want to discuss the issue of accountability. When Szantyr explained that they needed to talk

about "what [the respondent's] role was" in the events that led to the removal of the children, the respondent became more agitated and began to curse at Szantyr.

As the situation continued to escalate, Szantyr informed the respondent that she had to conclude the visit. At that point, the respondent, who was holding Azra, grew even more irate and started screaming at Szantyr. When Szantyr said that she needed to take Azra back, the respondent threw Azra in the air at Szantyr, who caught the child.[13] The respondent's outburst continued as they exited the restaurant. As Szantyr testified: "She was still very aggressive, very hostile towards me. Her language was still very cursing, she was angry. . . . [The respondent said] you're going to make up my visit bitch. . . . I don't give an f, I don't give an f. I'm calling my lawyer." The respondent then threw Azra's wet diaper at Szantyr. Once in her vehicle, Szantyr called her supervisor and informed her that she was very concerned for her own personal safety as well as Azra's safety. Freedman, who had submitted his updated psychological evaluation approximately six months *prior* to this incident, testified at trial that the respondent's behavior during that visit demonstrated a lack of parenting skills and a lack of self-control.

As the United States Supreme Court has observed, "[a]cceptance of responsibility is the beginning of rehabilitation." *McKune* v. *Lile*, 536 U.S. 24, 47, 122 S. Ct. 2017, 153 L. Ed. 2d 47 (2002). A finding that a respondent parent has failed to acknowledge her own personal issues that led to a child's removal may form the basis for a court's determination that she had not achieved a sufficient degree of personal rehabilitation. See, e.g., *In re Shane M.*, 318 Conn. 569, 589, 122 A.3d 1247 (2015) ("the respondent's failure to acknowledge the underlying personal issues that form the basis for the department's concerns indicates a failure to achieve a sufficient degree of personal rehabilitation" (internal quotation marks omitted)); *In re Jermaine S.*, supra, 86 Conn. App. 834 (respondent's inability to admit she had substance abuse problem "thwarted her ability to achieve rehabilitation"); *In re Sheila J.*, 62 Conn. App. 470, 481, 771 A.2d 244 (2001) (respondent failed to "accept or recognize her need" for recommended counseling).

In its decision, the court also expressly credited evidence that "[t]he department continues to have concerns regarding [the respondent's] ability to parent [the minor] children, given her explosive reactions to things that can trigger her. [She] has a history of intimate partner violence . . . and continues to demonstrate poor insight [into] the past as to how domestic violence has impacted her ability to provide safe, stable, appropriate, and adequate supervision to her children. . . . Despite completing [two] parenting programs, [the respondent] continued to use excessive physical disci-

pline which led to the removal of her children. When engaged in services, [she] is . . . fully engaged . . . [but] she continues to demonstrate poor judgment with regard to her interaction with her children. . . . [Her] behaviors observed are an ongoing concern for the department. . . . The department continues to have concerns regarding the type of interaction [the respondent] would have if there was no supervision, all of which remain a barrier to reunification." That evidence provides further support for the court's determination that the respondent has not achieved a sufficient degree of personal rehabilitation.

On appeal, the respondent implicitly concedes that she has not achieved the requisite degree of rehabilitation with respect to A'vion and Aaliyah, as she has not challenged the court's determination in that regard. Rather, she claims that, because there was no evidence that Azra suffered from the particular trauma symptoms exhibited by A'vion and Aaliyah, the court's determination as to Azra was improper. We do not agree. The factual findings that underlie the court's failure to rehabilitate determination—including the respondent's inability to acknowledge her own personal issues that led to the removal of the minor children, her failure to fully comply with the specific steps ordered by the court, and her inappropriate behavior during visits with the minor children—bear directly on the ultimate question of whether the respondent had achieved a sufficient degree of personal rehabilitation to assume a responsible position in Azra's life. Indulging every reasonable presumption in favor of the court's ruling, as our standard of review requires; see *In re Jayce O.*, supra, 323 Conn. 716; we conclude that the evidence credited by the court supports its conclusion that the respondent failed to achieve the requisite degree of personal rehabilitation required by § 17a-112 (j) (3) (B).

### III

As a final matter, we address the respondent's contention that the court improperly determined that the department made reasonable efforts to reunify her with the minor children. We conclude that the respondent's appeal is moot with respect to that claim.

"Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [this] court's subject matter jurisdiction . . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. . . . A case is considered moot if [the] court cannot grant the appellant any practical relief through its disposition of the merits . . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way. . . . Our review of the question of mootness is plenary." (Internal quotation marks omitted.) *In re Katia V.*, 214 Conn.

App. 468, 482, 281 A.3d 509, cert. denied, 345 Conn. 913, 283 A.3d 980 (2022).

Section 17-112 (j) (1) provides in relevant part that the Superior Court "may grant a petition [for termination of parental rights] if it finds by clear and convincing evidence that . . . the [department] has made reasonable efforts to locate the parent and to reunify the child with the parent . . . *unless* the court finds . . . that the parent is unable or unwilling to benefit from reunification efforts . . . ." (Emphasis added.) In construing that statutory language, our Supreme Court has explained that, "[b]ecause the two clauses are separated by the word 'unless,' this statute plainly is written in the conjunctive. Accordingly, the department must prove *either* that it has made reasonable efforts to reunify *or, alternatively*, that the parent is unwilling or unable to benefit from reunification efforts. . . . [E]ither showing is sufficient to satisfy this statutory element." (Emphasis in original.) *In re Jorden R.*, 293 Conn. 539, 552–53, 979 A.2d 469 (2009).

Because "either finding, standing alone, provides an independent basis for satisfying § 17a-112 (j) (1)"; id., 556; in cases in which the trial court concludes that *both* findings have been proven, a respondent on appeal must demonstrate that both determinations are improper. If the respondent fails to challenge either one of those "independent alternative" bases; id., 555; "the trial court's ultimate determination that the requirements of § 17a-112 (j) (1) were satisfied remains unchallenged and intact." Id., 557. In such instances, the appeal is moot, as resolution of a respondent's claim of error in her favor "could not [afford] her any practical relief."[14] Id., 554.

In *In re Natalia M.*, 190 Conn. App. 583, 585, 210 A.3d 682 (per curiam), cert. denied, 332 Conn. 912, 211 A.3d 71 (2019), this court dismissed a respondent's appeal for precisely that reason. As we explained: "In the present case, the [trial] court found that both alternatives set forth in § 17a-112 (j) (1) had been satisfied— the department had made reasonable efforts to reunify the respondent with the child, *and* the respondent was unable or unwilling to benefit from reunification efforts. Because the respondent challenges only one of the two separate and independent bases for upholding the court's determination that the requirements of § 17a-112 (j) (1) had been satisfied, even if we were to agree with his claim, the fact that there is a second independent basis for upholding the court's determination, which he does not challenge, renders us unable to provide him with any practical relief on appeal." (Emphasis in original.) Id., 588.

Like *In re Jorden R.*, supra, 293 Conn. 556, and *In re Natalia M.*, supra, 190 Conn. App. 588, the trial court in the present case found that both alternatives set forth in § 17a-112 (j) (1) had been satisfied. To obtain

practical relief, it therefore was incumbent on the respondent to properly challenge both findings. That she failed to do.

In part II of her appellate brief, the respondent contests the propriety of the court's finding that the department made reasonable efforts to reunify her with the minor children. Over the course of ten pages, she discusses relevant legal authority and the evidence before the court with respect to that claim. She has not, however, briefed any claim with respect to the court's finding that she alternatively was unwilling or unable to benefit from reunification efforts. The sole reference to that independent basis under § 17a-112 (j) (1) comes in a paragraph designated as subsection (a) and labeled "Introduction," in which the respondent argues that the department's reunification efforts "fell short of any standard of reasonableness." At the end of that introductory paragraph, the respondent states: "[The court] erred when it found that the [department] made reasonable efforts and when it found that [the respondent] was unable or unwilling to rehabilitate." In a subsequent subsection titled "The trial court erred when it found that [the department] fulfilled its statutory duty to make reasonable efforts at reunification, ignoring evidence that the agency refused to make referrals recommended by clinicians," the respondent offers her analysis of that claim. Nowhere in her appellate brief does she address the propriety of the court's finding that she was unwilling or unable to rehabilitate.

As our Supreme Court has noted, "[o]rdinarily, [c]laims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." (Internal quotation marks omitted.) *In re Elijah C.*, 326 Conn. 480, 495, 165 A.3d 1149 (2017); see also *Gonzalez* v. *O & G Industries, Inc.*, 341 Conn. 644, 697, 267 A.3d 766 (2021) ("[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly" (internal quotation marks omitted)). Apart from one conclusory sentence in the introduction subsection, the respondent makes no mention of any claim regarding the court's unwilling or unable to rehabilitate finding, nor does she provide any legal authority or discussion related thereto. Such a claim is not readily discernible from the respondent's brief and the record before us, which is the "dispositive question" in determining whether a claim has been adequately briefed. *In re Elijah C.*, supra, 495; see also *Burton* v. *Dept. of Environmental Protection*, 337 Conn. 781, 803, 256 A.3d 655 (2021) ("[f]or a reviewing court to judiciously and efficiently . . . consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs" (internal quota-

tion marks omitted)). Rather, the respondent's appellate brief focuses exclusively on the department's alleged failure to make reasonable efforts at reunification.[15]

Because the respondent has failed to properly challenge the court's findings with respect to both independent bases under § 17a-112 (j) (1), we decline to consider the merits of her claim that the court improperly determined that the department made reasonable efforts to reunify her with the minor children. Even if we were to agree with that claim, this court could not provide her any practical relief due to her failure to challenge the court's alternative finding regarding her unwillingness or inability to rehabilitate. Her claim, therefore, is moot. See *In re Jorden R.*, supra, 293 Conn. 557; *In re Natalia M.*, supra, 190 Conn. App. 588.

The appeal is dismissed with respect to the respondent's claim that the court improperly determined that the department made reasonable efforts at reunification; the judgments are affirmed in all other respects.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** January 12, 2023, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The court also terminated the parental rights of the biological father of A'vion, Aaliyah, and Azra, whom we refer to as the father in this opinion. Because he has not appealed, we refer to the respondent mother as the respondent. We refer to A'vion, Aaliyah, and Azra collectively as the minor children.

We also note that both the attorney for the minor children and the guardian ad litem for the minor children filed statements adopting the brief of the petitioner in this appeal pursuant to Practice Book §§ 67-13 and 79a-6 (c).

[2] The pediatrician who treated the children prepared a written report that was admitted into evidence and testified at trial regarding her conversation with the respondent following that incident. On the day that the injuries to A'vion were discovered, the respondent stated that she received a text message from a " 'male companion' " at 2 a.m. or 3 a.m., that she departed the family home to be with that companion, that she left the minor children in the care of a seventeen year old babysitter, and that she did not return home until after A'vion and Aaliyah had left for school that morning.

[3] The specific steps issued on January 11, 2018, required, among other things, the respondent (1) to "[t]ake part in counseling and make progress toward the identified treatment goals," (2) to "[s]ign releases allowing [the department] to communicate with service providers to check on your attendance, cooperation and progress toward identified goals," and (3) to "[i]mmediately let [the department] know about any changes in the make-up of the household . . . ."

[4] The respondent thereafter filed a motion to consolidate the termination trial with her motion to revoke the commitment of the minor children, which the court granted.

[5] "A 'permanency plan' is the proposal for what the long-term, permanent solution for the placement of the child should be. . . . Our statutory scheme provides five permanency options: (1) reunification with a parent; (2) long-term foster care; (3) permanent guardianship; (4) transfer of either guardian-

ship or permanent guardianship; or (5) termination followed by adoption." (Citations omitted; footnote omitted.) *In re Adelina A.*, 169 Conn. App. 111, 121, 148 A.3d 621, cert. denied, 323 Conn. 949, 169 A.3d 792 (2016). If a court does not approve a proposed permanency plan, it may order the petitioner to submit another permanency plan, on which another hearing must be scheduled. See Practice Book § 35a-14 (e).

[6] The record indicates that the department initially referred the respondent to All Pointe Care for parenting education services. When that provider did not have any staff members available in August or September, 2019, the department issued a referral to AHAVA Family Services, LLC. As the court found in its memorandum of decision, although the department "immediately contacted [the respondent] by email to attempt to coordinate scheduling" with that provider, the respondent "refused to confirm any dates or times that would accommodate her schedule . . . ." The respondent ultimately received parent coaching services with Connecticut Youth Services in late 2019.

[7] As the petitioner's counsel emphasized at the October 17, 2019 hearing, the motion to compel was *not* predicated on any intentional violation of a court order by the petitioner. Rather, it was based on the respondent's contention that the department should provide additional services in light of the updated evaluation recently filed by Freedman.

[8] In her appellate brief, the respondent asserts that reunification "is fundamentally constitutional in nature" and cites to *In re Teagan K.-O.*, 335 Conn. 745, 755, 242 A.3d 59 (2020), in which our Supreme Court observed that "[a] constellation of constitutional and statutory rights serve to protect the integrity of the family unit, the parent-child relationship, and the best interest of the child." She has provided no authority that supports the claim that vindication of those rights must be advanced via a motion to compel given the procedural posture of this case.

[9] For that reason, we reject the petitioner's alternative contention that the court's denial of the motion to compel constituted an immediately appealable order that precludes appellate review due to the respondent's failure to take an interlocutory appeal. Unlike the orders of temporary custody at issue in *In re Shamika F.*, 256 Conn. 383, 773 A.2d 347 (2001), and *Madigan* v. *Madigan*, 224 Conn. 749, 620 A.2d 1276 (1993), which our Supreme Court expressly considered in light of "constitutional considerations"; *In re Shamika F.*, supra, 404; the denial of a motion to compel additional services filed shortly before the commencement of a termination trial, at which the petitioner bears the burden of establishing that it made reasonable efforts at reunification, does not terminate "a separate and distinct proceeding, or . . . so [conclude] the rights of the parties that further proceedings cannot affect them." *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983). We therefore conclude that, on the particular facts of this case, the denial of the respondent's motion to compel was not an immediately appealable interlocutory order.

[10] The minor children were removed from the respondent's care on October 3, 2017; the hearing on the motion to compel was held on October 17, 2019.

[11] To continue to receive federal funding, the federal Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, 111 Stat. 2115, requires states to enact certain provisions, which in turn require timely action in juvenile proceedings. See, e.g., General Statutes § 17a-15 (b) (requiring petitioner to review permanency plan for each child under her care "at least every six months"); General Statutes § 17a-110a (a) ("[i]n order to achieve early permanency for children, decrease children's length of stay in foster care, reduce the number of moves children experience in foster care and reduce the amount of time between termination of parental rights and adoption, the [petitioner] shall establish a program for concurrent permanency planning"); General Statutes § 17a-111a (a) (1) (requiring petitioner to file petition to terminate parental rights when "the child has been in the custody of the [petitioner] for at least fifteen consecutive months, or at least fifteen months during the twenty-two months, immediately preceding the filing of such petition"); General Statutes § 46b-129 (k) (1) (A) (requiring motion for review of permanency plan to be filed with court "[n]ine months after placement of the child . . . in the care and custody" of petitioner); see generally *In re Darien S.*, 82 Conn. App. 169, 174–76, 842 A.2d 1177 (2003) (reviewing history of federal permanency plans for children who have been removed from parents and observing that "our legislature passed several pieces of legislation to keep the state in compliance with federal law and thereby to continue to receive federal funds"), cert. denied, 269 Conn. 904, 852 A.2d 733 (2004). Notably, each component of this statutory scheme providing for

permanency planning, including reunification services with parents, requires notice to parents and an opportunity to be heard. See, e.g., General Statutes § 17a-15 (c) (parents aggrieved by plan of treatment services, temporary or permanent placement, including reunification services with parent, entitled to administrative hearing, which outcome can be appealed to Superior Court).

[12] "Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *In re Jacob W.*, 330 Conn. 744, 770, 200 A.3d 1091 (2019).

[13] Szantyr testified that Azra "was very scared" after the respondent threw her at Szantyr.

[14] For that reason, when an appellate court concludes that the trial court properly found that one of those independent bases was proven, the appellate court lacks subject matter jurisdiction to thereafter consider a claim of error with respect to the alternative basis under § 17a-112 (j) (1). Appellate review of that alternative basis is a "moot issue" because any decision thereon "cannot benefit the respondent meaningfully." *In re Jorden R.*, supra, 293 Conn. 557; see also id., 554 (appellate courts "should not address a moot issue substantively").

[15] Five weeks after the respondent filed her principal appellate brief with this court, the petitioner filed her appellate brief, in which she argued that the respondent's claim is moot due to her failure to properly challenge both findings made by the trial court pursuant to § 17a-112 (j) (1). The respondent did not file a reply brief with this court. See Practice Book § 67-5A.

---